**Robert G. PONTIUS, M.D., Plaintiff,**

v.

**CHILDREN'S HOSPITAL, a Pennsylvania Non-Profit corporation, and Henry T. Bahnson, M.D., Lenox D. Baker, M.D., Thomas K. Oliver, Jr., M.D., James R. Zuberbuhler, M.D., Defendants.**

Civ. A. No. 78–987.

United States District Court,
W.D. Pennsylvania.

Dec. 30, 1982.

*See Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980).

Robert X. Medonis, Pittsburgh, Pa., for plaintiff.

Stewart M. Flam, Dickey, McCamey & Chilcote, John S. Sherry, Pittsburgh, Pa., for Bahnson, Baker, Oliver and Zuberbuhler.

George M. Weis, Weis & Weis, Richard T. Wentley, John C. Unkovic, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for Children's Hosp.

## OPINION

COHILL, District Judge.

### Introduction

In November of 1975, Children's Hospital determined not to reappoint the plaintiff, Dr. Robert G. Pontius, to his post as a cardiovascular surgeon. The hospital reached this decision after proceedings which comported not merely with the constitutional requisites of due process, but very nearly the procedural trappings of a full scale trial. The plaintiff now seeks to use federal antitrust laws effectively to ob-tain judicial review of the hospital's decision not to retain him on its staff. Dr. Pontius also names in his suit four individual physicians who allegedly acted against him in ways violative of the Sherman Act, 15 U.S.C. §§ 1–7. Because the plaintiff has failed to raise any question of material fact suggesting that the hospital's decision violated the antitrust laws, the motion of defendant Children's Hospital for summary judgment must be granted. With respect to the individual defendants, the plaintiff has also failed to raise a genuine issue of fact which would permit a finding of a Sherman Act violation. Consequently, the individual defendants are likewise entitled to summary judgment.

### I. The Parties

#### A. The Plaintiff

Robert G. Pontius, M.D., graduated from Haverford College, Haverford, Pennsylvania in 1945, and from the Medical School, University of Pennsylvania in 1947. He interned at the Hospital of the University of Pennsylvania from 1947 to 1948. He was an assistant instructor, Department of Pharmacology, University of Pennsylvania School of Medicine from 1948 to 1949. *See* Pontius Affidavit, Plaintiff Curriculum Vitae (Exhibit "A").

Dr. Pontius did his surgical residency at Jefferson Davis Hospital, Houston, Texas during 1949 to 1950. He was the Chief Resident at Jefferson Davis and Veteran's Administration Hospital from 1954 to 1955. He was a resident in the Thoracic Surgery Program at Baylor University College of Medicine and Affiliated Hospitals, Houston, Texas from 1955 to 1956. He was a Research Fellow in Surgery, The Children's Hospital, Harvard Medical School, Boston, Massachusetts from 1956 to 1957.

Dr. Pontius served in the U.S. Navy during World War II from 1942 to 1945 and in the Navy Reserve during the Korean War. His medical career includes a considerable amount of scholarship. He has published thirty-three scholarly works. Notable among Dr. Pontius' coauthors are the famous Texas heart surgeons, Doctors Denton

A. Cooley and Michael DeBakey. Dr. Pontius also coauthored publications with two defendants in this action, Henry G. Bahnson, M.D. and James R. Zuberbuhler, M.D. *Id.*

Dr. Pontius has conducted thirty-five presentations to various seminars and professional meetings in the United States and Europe. He is the author, coauthor and producer of twelve motion pictures dealing with various adult and pediatric cardiovascular surgical topics. Dr. Cooley was a coauthor with Dr. Pontius of one of the motion pictures. In 1974 Dr. Pontius was the president of a chapter of the American College of Surgeons and president of a chapter of the American Heart Association in 1967.

In 1957 the late William B. Kiesewetter, M.D., Chief of Surgical Services at Children's Hospital of Pittsburgh, conducted a search for a qualified cardiovascular surgeon to do cardiac surgery on a full time basis. As a result of this inquiry, Children's Hospital hired Dr. Pontius.

## B. *The Defendants*

### 1. *Children's Hospital*

Children's Hospital of Pittsburgh is a non-profit corporation organized under the laws of the Commonwealth of Pennsylvania and affiliated with the University of Pittsburgh Medical School. As its name suggests, Children's Hospital is a specialized facility devoted to the care and treatment of young persons, generally those under seventeen years of age. *See Robinson v. Magovern,* 521 F.Supp. 842, 878 (W.D.Pa. 1981), *aff'd mem.,* 688 F.2d 824 (3d Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982). The hospital has acquired a national reputation, particularly in the field of organ transplantation.

### 2. *Henry T. Bahnson, M.D.*

Dr. Bahnson attended Davidson College and Harvard Medical School, graduating from the latter in 1944. He interned and took his residency at the Johns Hopkins Hospital. He achieved board certification in general and thoracic surgery in 1953. Prior to 1963, when Dr. Bahnson joined the staff and faculty at the University of Pittsburgh Medical School and Children's Hospital, he was on the staff at Johns Hopkins Hospital. In 1963 Dr. Bahnson came to Pittsburgh, taking his position as full professor and head of the department of surgery at the medical school. *See generally* Bahnson Deposition at 4–10.

### 3. *Lenox D. Baker, M.D.*

Dr. Baker attended Davidson College for two years before being accepted into Johns Hopkins Medical School, from which he graduated in 1966. He completed his internship and residency at the University of Pittsburgh from 1967 through 1972. Dr. Baker received board certification in general surgery in 1973 and thoracic surgery in 1974. Following his stay at the University of Pittsburgh, Dr. Baker put in two years of public service with the United States Public Health Service; first as assistant director of surgery at the medical center of the federal prison in Springfield, Missouri, later as chief of surgery at the Services' Indian Hospital in Talihina, Oklahoma. Following the completion of his public service, Dr. Baker practiced first in Phoenix and later in Norfolk, Virginia. While in Pittsburgh, Dr. Baker worked in Children's Hospital and had occasion to work with Dr. Pontius. *See generally* Baker Deposition at 3–13.

### 4. *Thomas K. Oliver, M.D.*

Dr. Oliver attended the University of California at Berkeley and Harvard Medical School. He graduated from the latter in 1949. His internship and residency took place at Cornell University's New York Hospital Center. Dr. Oliver completed his training in 1955. He was board certified in pediatrics with a sub-specialty certification in neonatal/perinatal medicine.

Following the completion of his training, Dr. Oliver served on a two year research fellowship at the Karolinska Institute in Stockholm. From 1955 to 1963 he was an assistant professor of pediatrics at Ohio

State University and on the staff of Children's Hospital of Columbus. From 1963 to 1970 he was a member of the faculty at the School of Medicine of the University of Washington in Seattle. In 1970 Dr. Oliver came to Pittsburgh as chairman of the Department of Pediatrics of the University of Pittsburgh School of Medicine and the medical director of Children's Hospital. *See generally* Oliver Deposition at 4–8.

### 5. James R. Zuberbuhler, M.D.

Dr. Zuberbuhler attended Allegheny College and the University of Pennsylvania Medical School. Following his graduation from medical school in 1956, Dr. Zuberbuhler started his residency in cardiology at the University of Michigan and finished it at the University of Pennsylvania. His residency was interrupted by military service. Dr. Zuberbuhler started part time work at Children's Hospital in 1961 and became a full time employee in 1963, at which time he also became an assistant professor in the medical school. Since 1967 he has held the post of Director of Cardiology at Children's Hospital. He is also a full professor of pediatrics at the University of Pittsburgh. *See generally* Zuberbuhler Deposition at 4–9.

### II. Statement of Facts

On December 5, 1957 Children's Hospital hired Dr. Robert G. Pontius as a full-time member of the medical staff to implement a program in pediatric cardiothoracic surgery. Simultaneously, Dr. Pontius received an appointment as Assistant Professor at the University of Pittsburgh School of Medicine. *See* Gaffney Deposition Exhibit No. 1 attached to the Appendix to the individual defendant's Motion for Summary Judgment as Exhibit "A." (Unless otherwise indicated, all references to exhibits in this opinion refer to the exhibits attached to the foregoing appendix.) Under his contractual arrangement, which mirrored the arrangement of all full-time staff members, Dr. Pontius was paid a flat salary. *See id.* and Pontius Deposition at 22. In October of 1960 Dr. Pontius elected to terminate this contractual arrangement with Children's

Hospital and enter private practice. Under this arrangement, Dr. Pontius received no compensation from Children's Hospital, but instead billed his fees directly to his patients. *See* Pontius Deposition at 23.

In 1963 Henry T. Bahnson, M.D. was appointed Chairman of the Department of Surgery at the University of Pittsburgh School of Medicine. *See* Bahnson Affidavit at ¶ 2. Over the objections of Dr. Pontius, he was also appointed to the staff at Children's Hospital. Dr. Pontius alone opposed the appointment. *See* Exhibit "A."

Around 1970 and 1971 Dr. Pontius began to make allegations of improper referrals of surgical patients to cardiovascular surgeons by cardiologists at Children's Hospital. When the complaints continued, Thomas K. Oliver, M.D., in his capacity as Medical Director at Children's Hospital, wrote to Dr. Pontius stating he had investigated the allegations and had found them totally lacking in merit. *See* Dr. Oliver's letter, Exhibit "B."

Dr. Pontius apparently remained dissatisfied with the referral practices. In 1971 he spoke to the parents of one Lisa Valentino, attempting to convince them to change their decision to use Dr. Bahnson instead of himself to operate on their daughter. This conduct prompted Dr. Oliver to write Dr. Pontius and state that the Valentinos had freely chosen Dr. Bahnson as their surgeon and that Dr. Pontius's actions would be brought to the attention of the Medical Executive Committee of Children's Hospital. *See* Exhibit "C."

On February 28, 1973 the Executive Committee of the Medical Staff unanimously voted to censure Dr. Pontius as a result of a written order given by Dr. Pontius concerning an intensive care patient named Kimberly Miller. The order read: "No more orders without my approval. Call me 963–7819." The Committee found that this order was "inimical to the best possible care" and "contrary to the maintenance of educational standards." *See* Exhibit "D."

Appointments to the staff at Children's Hospital are annually reviewed by a credentials committee composed of independent

members of the medical staff. *See* Oliver Affidavit at ¶ 3. On May 28, 1975, Dr. Pontius's qualifications as a thoracic and cardiovascular surgeon were discussed, along with those of all other doctors on the staff. *See* Oliver Affidavit at ¶ 4. The Credentials Committee unanimously recommended that Dr. Pontius not be reappointed to the staff, effective July 1, 1975. By letter dated June 9, 1975, Dr. Oliver notified Dr. Pontius of this decision, explaining that in the Committee's judgment, his professional activities did not meet "the minimal standards" necessary to "assure continued competence in cardiovascular surgery. *See* Exhibit "E." In the same letter, Dr. Oliver advised Dr. Pontius of his rights under the Bylaws of the Medical Staff then in force to appeal the decision of the Credentials Committee and receive a hearing before a combined session of the Executive Committee of the Medical Staff and the Joint Conference Committee. *See* Exhibit "E."

Because the Executive Committee included members of the Credentials Committee, counsel for Dr. Pontius requested that the hospital select an ad hoc hearing committee composed of persons who had not taken part in the decision to reappoint Dr. Pontius to the staff to hear Dr. Pontius's case. Counsel also asked that both the Credentials Committee and Dr. Pontius be permitted to present evidence in support of their respective positions and that all testimony be recorded. *See* Exhibit "F."

These requests were granted, and on June 25, 1975, an ad hoc committee of five medical staff members was appointed to review the Credentials Committee's decision not to reappoint Dr. Pontius to staff. Dr. Paul Gaffney was appointed Chairman of the Committee.

The initial meeting of the Ad Hoc Committee took place on June 26, 1975. Shortly after the hearing commenced, the parties jointly decided to suspend the hearing, pending preparation of a complete list of the reasons, together with supportive material, for the decision not to reappoint Dr. Pontius to the Children's Hospital staff.

*See* pp. 32–35 of the Transcript of the Ad Hoc Committee Hearing also marked as Exhibit "G."

The charges against Dr. Pontius were compiled in a document entitled "Matters to be Considered by the Ad Hoc Committee with Regard to the Decision of the Credentials Committee Not to Reappoint Robert G. Pontius, M.D. to the Staff of Children's Hospital" (hereinafter the "Blue Book") and was submitted to Dr. Pontius's counsel on October 3, 1975. *See* Exhibit "H." The table of contents to the Blue Book outlines the reasons for the decision not to reappoint Dr. Pontius. They included: (1) Incompetence; (2) The excessive mortality rate among Dr. Pontius's patients; (3) Unnecessary operations; (4) Failure to adhere to the standard medical practices; (5) Failure to adhere to the established teaching practices of Children's Hospital; (6) Unprofessional conduct with patients; (7) Inability to cooperate with other surgeons and staff members; and (8) Insufficient recent surgical experience.

The supporting materials to the Blue Book included a letter from defendant, Dr. Lenox D. Baker. Dr. Baker is a cardiothoracic surgeon, who had worked as a surgical resident under Dr. Pontius before leaving Children's Hospital in June, 1972. *See* Baker Affidavit at ¶ 2 and ¶ 3. The letter was submitted at the request of Dr. Bahnson, who had asked Dr. Baker to outline his experiences with Dr. Pontius during this period. *See* Baker Affidavit at ¶ 3 and Bahnson Affidavit at ¶ 6. The letter was confidential and was shown only to the members of the Ad Hoc Hearing Committee. *See* "Blue Book" and Exhibit "I." Counsel for Dr. Pontius suggests in his brief, at 17–19, that the lack of opportunity to cross examine Dr. Baker on the contents of his letter represents a dreadful breach of due process. While we are not completely comfortable with the secret receipt of evidence by the Ad Hoc Committee, we are far from certain that confidentiality of such information is inappropriate in the narrow parameters of a staff privilege hearing. In any event, the plaintiff has not alleged a violation of his right to due process.

The Ad Hoc Hearing Committee reconvened on November 11, 1975. Along with the Blue Book, the Committee received a document prepared by counsel for Dr. Pontius entitled: "Dr. Pontius'" Position with Regard to the Question Concerning his Reappointment to the Staff of Children's Hospital. *See* Exhibit "J." The Committee heard testimony from Drs. Oliver, Bahnson, Kieswetter (Chief of Surgery at Children's Hospital), Zuberbuhler and Dr. Pontius himself. Counsel for Dr. Pontius was given ample opportunity to cross-examine all witnesses. Indeed Dr. Pontius has not alleged that the hearing failed to comport with all due process requirements. *See* transcript of the November 11, 1975 hearing, also marked as Exhibit "K."

The Ad Hoc Committee voted unanimously not to reappoint Dr. Pontius to the staff of Children's Hospital. *See* Exhibit "L." Dr. Pontius then appealed this decision to the Hospital Board of Trustees. The decision was affirmed in April, 1976. *See* Exhibit "M." This action was filed on September 5, 1978.

### III. *The Claims of Dr. Pontius*

The plaintiff's complaint contains six counts, four arising under the federal antitrust laws and two pendent counts purporting to raise claims under state law. In view of our decision on the antitrust claims, we express no opinion as to the merits of the state law counts.

Broadly speaking, counts one and two allege violations of section 1 of the Sherman Act, 15 U.S.C. § 1,[1] by charging that the defendants conspired to boycott the plaintiff's surgical practice and generally restrain trade and competition among doctors. *See* Complaint at 9–11. Counts three and four of the Complaint appear to allege violations of section 2 of the Sherman Act, 15 U.S.C. § 2:[2] count three claims that the defendants conspired "to restrain trade in and monopolize the trade of thoracic and cardio-vascular surgery," Complaint at 11; count four alleges concerted action by the defendants to monopolize by excluding Dr. Pontius from "the business of pediatric thoracic and cardiovascular surgery in Allegheny County." *Id.* at 13. The plaintiff has a cause of action for these alleged violations of the Sherman Act pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15.[3] The claims under sections 1 and 2 of the Sherman Act really represent two sides of the same coin: eliminating Dr. Pontius from practice at Children's Hospital would necessarily have the consequence of increasing the "market" share of the remaining physicians if no additional physicians came on staff.

### IV. *The Applicable Law*

#### A. *Jurisdiction*

■ Before reaching the merits of this case at the summary judgment stage, the

---

**1.** Section 1 of the Sherman Act provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
15 U.S.C. § 1.

**2.** Section 2 of the Sherman Act provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce

among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
15 U.S.C. § 2.

**3.** Section 4 of the Clayton Act provides:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
15 U.S.C. § 15.

defendants raise the threshold question of our subject matter jurisdiction. It is well established that a claim under the Sherman Act requires that the proscribed actions directly involve or substantially affect interstate commerce in order to support subject matter jurisdiction. *See Doctors, Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48 (3d Cir.1973). The defendants earnestly argue that while the overall activities of Children's Hospital, a highly specialized institution, (the closest analogous facilities are located in Columbus, Ohio, Philadelphia, and Baltimore) might be said to substantially affect interstate commerce, the specific act of denying staff privileges to one doctor is insufficient to create Sherman Act jurisdiction. This jurisdictional challenge appears to be foreclosed by our opinion in *Robinson v. Magovern,* 521 F.Supp. 842, 876–877 (W.D.Pa.1981), *aff'd mem.,* 688 F.2d 824 (3d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 302, 74 L.Ed.2d 283, but in light of at least one recent case, we are persuaded that some portions of that opinion warrant reconsideration.

In *Robinson v. Magovern,* we suggested that the antitrust plaintiff need only establish "that the defendants' activities had a substantial effect on interstate commerce." 521 F.Supp. at 876. We are persuaded by the thoughtful reasoning of former Chief Judge Lord in *Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Center,* 536 F.Supp. 1065 (E.D.Pa.1982), that "in any denial of hospital staff privileges case, the only relevant jurisdictional inquiry involves a determination of whether the defendant hospital's denial of staff privileges to the plaintiff physician substantially and directly affects the *plaintiff's* activities in interstate commerce." *Id.* at 1076 (emphasis in the original).

*Cardio-Medical Associates* involved facts broadly similar to those alleged in the case *sub judice.* Cardio-Medical Associates, Ltd. was an incorporated group of four physicians who had general staff privileges at the defendant Crozer-Chester Medical Center, but had failed in their effort to secure certain specialized privileges. *Id.* at 1069. The plaintiffs alleged violations of federal antitrust and civil rights laws. Judge Lord held that the interstate commerce allegations contained in the complaint were inadequate to support jurisdiction under the Sherman Act. Consequently, he dismissed the antitrust count of the complaint. This dismissal was without prejudice so as to afford the plaintiff an opportunity to allege the requisite links to interstate commerce, but Judge Lord strongly hinted that any such efforts would be futile. *Id.* at 1084–1085.

While we agree with the jurisdictional test enunciated by Judge Lord, we respectfully disagree with his application of that test. We believe that many individual physicians, including Dr. Pontius, could demonstrate that the denial of staff privileges affects their activities in interstate commerce. Whether it is the purchase of drugs and other medical supplies, the payment of medical bills by insurers, or crossing state lines to see a specialist, modern medical practice generally involves sufficient interstate commerce to trigger Sherman Act jurisdiction.

In *Cardio-Medical Associates,* Judge Lord was explicitly concerned with the ramifications of staff-privilege related suits. *Id.* at 1069. We share his concerns and also agree with what we see as the thrust of his opinion: the pressing need to avoid the expense of antitrust litigation in an "industry" already highly regulated and fraught with serious problems of cost and quality control. We do not believe, however that this jurisdictional solution comports with the dictates of *Doctors Inc. v. Blue Cross of Greater Philadelphia,* 490 F.2d 48, 50 (3d Cir.1973).

We have grave doubts that the Sherman Act was ever really intended to provide the federal courts with jurisdiction over this class of cases, but given the decisional gloss of recent years, we believe that with the exception of *purely* local commercial activities, further jurisdictional limitations ought to come from Congress rather than the district courts. Consequently, we hold that Dr. Pontius has shown a sufficient nexus

between the alleged acts of the defendants and his activities in interstate commerce to establish the jurisdiction of this court.

## B. Standard for Summary Judgment

This case is before us on the defendants' motions for summary judgment. Pursuant to Federal Rule of Civil Procedure 56(c), a federal court will grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." When considering a motion for summary judgment, a court must view the facts in the light most favorable to the non-moving party. *See Goclowski v. Penn Central Transportation Company,* 571 F.2d 747, 751 (3d Cir.1977); *Smith v. Pittsburgh Gage and Supply Company,* 464 F.2d 870, 874 (3d Cir.1972). The movant has the burden of establishing that no genuine issue of fact exists. *See Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840, 848 (3d Cir. 1974).

Rule 56(e) of the Federal Rules of Civil Procedure states, however, that "[w]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegation or denials of his pleadings, but his response . . . must set forth specific facts showing that there is a genuine issue for trial." The Supreme Court has made it clear that Rule 56(e) should not "be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations." *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289–290, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968).

While we do not believe that the nature of this particular suit in any way alters the standard articulated for the grant of summary judgment, we must note, at least in passing, that the erroneous denial of summary judgment in a case of this sort poses grave and unusual dangers to the proper administration of health care in this nation. If a physician, terminated from hospital privileges after receiving due process, is able to force the hospital to assume the burdens of an antitrust trial on the mere allegation that the hospital's decision was grounded on reasons violative of the Sherman Act, the ability of hospitals to regulate their medical staffs will be seriously impaired. Furthermore, if *individual physicians,* who manage to overcome their traditional reluctance to testify about the professional conduct of a colleague, know that by so doing they risk incurring legal fees running into six figures and a trial of a duration measured in months, on the mere allegation that they have conspired to restrain trade, the discovery of incompetent physicians will be rendered extraordinarily difficult. Consequently we believe that a trial court ought to conduct a particularly close scrutiny of the record in hospital staff privilege cases to determine whether or not genuine issues of material fact—facts which, if proven at trial, would support a judgment for the plaintiff—actually exist. A thorough examination of the materials before us, the products of more than two years of extensive discovery, convinces us that no such disputed facts are present.

## C. Antitrust Analysis of Staff Privilege Cases

Antitrust suits grounded on the denial, termination, or limitation of hospital staff privileges have proliferated in recent years. *See* Kissam, Webber, Bigus & Holzgraefe, *Antitrust and Hospital Privileges: Testing the Conventional Wisdom,* 70 Cal.L.Rev. 595, 596 & n. 2 (1982) (The authors provide an exhaustive list of staff privilege cases.). This growth stems, in large part, from a pair of Supreme Court cases which dismantled the two previously fatal obstacles to such suits. Both barriers were jurisdictional in character, though only the first was specifically so denominated. The first of these obstacles was the jurisdictional requirement that the disputed conduct be in the flow of, or substantially affect, inter-

state commerce. *See Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974). Prior to *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), it was generally thought that medical services provided by and in a hospital did not meet this jurisdictional requirement. *See Hospital Building Co. v. Trustees of Rex Hospital*, 511 F.2d 678, 682 (4th Cir.1975) (en banc).

*Hospital Building Co.* involved a plaintiff medical corporation which operated a small hospital and sought to expand its facilities in Raleigh, North Carolina. The plaintiff alleged that the defendants, who included the trustees of another local hospital, had conspired to block state approval of the expansion and, when that failed, further conspired to use bad faith tactics to impede the completion of the expansion. The district court granted the defendant's motions to dismiss the amended complaint for failure to allege levels of interstate activity sufficient to invoke the Sherman Act.

The Fourth Circuit Court of Appeals affirmed the district court in an *en banc* opinion. *Hospital Building Co. v. Trustees of Rex Hospital*, 511 F.2d 678 (4th Cir.1975) (en banc). The Fourth Circuit expressed dissatisfaction with "the absence of a clear line, much less a bright one" between substantial and insubstantial effects on interstate commerce, *id.* at 685, but still held that the case before it fell outside the sphere of the Sherman Act, involving only a *"de minimus"* effect on interstate commerce. The Fourth Circuit distinguished *Doctors, Inc. v. Blue Cross of Greater Philadelphia*, 490 F.2d 48 (3d Cir.1973) on the straightforward ground that the potential impact on interstate commerce of the conspiracy alleged in *Doctors, Inc.* was vastly greater than that involved in *Hospital Building Co.* 511 F.2d at 684.

The Supreme Court granted *certiorari* and reversed the Fourth Circuit in a short, unanimous opinion. *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). The Court simply held that the allegations contained in the complaint were sufficient to sustain Sherman Act jurisdiction:

> The complaint, fairly read, alleges that if respondents and their coconspirators were to succeed in blocking petitioner's planned expansion, petitioner's purchases of out-of-state medicines and supplies as well as its revenues from out-of-state insurance companies would be thousands and perhaps hundreds of thousands of dollars less than they would otherwise be. Similarly, the management fees that petitioner pays to its out-of-state parent corporation would be less if the expansion were blocked. Moreover, the multimillion-dollar financing for the expansion, a large portion of which would be from out of State, would simply not take place if the respondents succeeded in their alleged scheme. This combination of factors is certainly sufficient to establish a "substantial effect" on interstate commerce under the Act.

*Id.* at 744, 96 S.Ct. at 1852.

Unfortunately we still do not have a clear pathway to follow. The Supreme Court said only that the jurisdictional allegations in *Hospital Building Co.* met the jurisdictional threshold for the Sherman Act but gave no guidance as to the point at which the impact of challenged activity on interstate commerce becomes insubstantial.

As previously noted, some courts have been tempted by the absence of any sort of a fine line test in *Hospital Building Co.* to hold that staff privilege cases do not involve sufficient effect on interstate commerce to invoke the antitrust laws. *See Cardio-Medical Associates, Ltd. v. Crozer-Chester Medical Center*, 536 F.Supp. 1065. While we recognize that a strong case can and has been made that such jurisdictional limits are not foreclosed by *Hospital Building Co.*, we decline to adopt such a view.

The other legal development which opened the door for antitrust suits grounded on the denial of staff privileges was the end of what had been perceived as an antitrust exemption for the "learned professions," including medicine. This "exemption" was drastically curtailed in *Goldfarb*

*v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

*Goldfarb* was a class action in which the plaintiffs sought to attack, on antitrust grounds, the application of a fee schedule published, and made obligatory on attorneys, by the state and county bar associations. The district court conducted a trial and found that while the state bar association was immune from the liability under the state action exemption of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the county (Fairfax) bar association was liable for Sherman Act violations. *See Goldfarb v. Virginia State Bar,* 355 F.Supp. 491 (E.D.Va.1973).

On appeal, the Fourth Circuit agreed with the district court's holding as to the non-liability of the state bar association, but reversed on the application of the Sherman Act to the county bar association, holding that the practice of law was neither trade nor commerce. *Goldfarb v. Virginia State Bar,* 497 F.2d 1, 15 (4th Cir.1974). As the Fourth Circuit explained, in language of considerable interest for the case now before us:

> We believe that much of the criticism of this "learned profession" exemption is the result of a misunderstanding of its nature and extent. The exemption is not a personal immunity from prosecution, but is rather a recognition that the Sherman Act prohibits only those restraints which are upon trade or commerce. The occupation of one who violates the Sherman Act is irrelevant. If a group of doctors conspire to obstruct the interstate sale of health insurance their professional status would be no defense.[42] On the other hand, if a group of doctors conspire to restrain the practice of another doctor there is no Sherman Act violation because that which is restrained (i.e., the practice of a learned profession, medicine) is neither trade nor commerce.[43] With that distinction in mind, it should be clearly discernible that the impact of the Association's fee schedule in the instant case upon competition among attorneys for real estate work is not within the scope of the Sherman Act.

[42] *American Medical Ass'n v. United States,* 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943). The Court declined to resolve the question of whether the practice of medicine was a "trade" within the meaning of the Sherman Act. What the Court held was that the sale of health insurance was interstate trade and that a conspiracy among doctors to restrict it violated the Sherman Act.

[43] *Riggall v. Washington County Medical Soc'y,* 249 F.2d 266 (8 Cir.1957).

*Id.* at 14–15.

The Supreme Court granted *certiorari* and reversed. 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1974).

> In arguing that learned professions are not "trade or commerce" the County Bar seeks a total exclusion from antitrust regulation. Whether state regulation is active or dormant, real or theoretical, lawyers would be able to adopt anticompetitive practices with impunity. We cannot find support for the proposition that Congress intended any such sweeping exclusion. The nature of an occupation, standing alone, does not provide sanctuary from the Sherman Act, *Associated Press v. United States,* 326 U.S. 1, 7 [, 65 S.Ct. 1416, 1418, 89 L.Ed. 2013] (1945), nor is the public-service aspect of professional practice controlling in determining whether § 1 includes professions. *United States v. National Assn. of Real Estate Boards,* 339 U.S. [485] at 489 [70 S.Ct. 711 at 714, 94 L.Ed. 1007]. Congress intended to strike as broadly as it could in § 1 of the Sherman Act, and to read into it so wide an exemption as that urged on us would be at odds with that purpose.

*Id.* 421 U.S. at 787, 95 S.Ct. at 2013.

While declining to extend a broad exemption from antitrust enforcement to the "learned professions," the Court did suggest that conduct proscribed by the Sherman Act in a commercial context might well be lawful in a professional service situation:

> The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic

to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently. We intimate no view on any other situation than the one with which we are confronted today.

*Id.* at 788–789 n. 17, 95 S.Ct. at 2013–14 n. 17.

Neither *Hospital Building Co.* nor *Goldfarb* compelled an extension of the Sherman Act to medical staff privilege cases. There is a great deal of difference between the impact on interstate commerce of restraining a multi-million dollar hospital expansion and restraining the surgical practice of one physician. Similarly, there is a considerable difference, in terms of the purposes of the Sherman Act, between a state or county-wide price-fixing agreement and a collective decision taken by several doctors not to refer their patients to a particular surgeon. The jurisdictional problem in the aftermath of *Hospital Building Co.* and *Goldfarb* is that the Supreme Court eliminated two important principles which had limited the application of the Sherman Act, without providing any guidance as to what may be the new limits. This lack of guidance creates a serious difficulty for the district courts because unless some line can be drawn between those restraints covered by the Sherman Act and those beyond its scope, every private decision of monetary consequence to an individual or corporation may become the subject of a lawsuit. Given the enormous burdens imposed on all parties by antitrust litigation, it is of vital importance that the courts develop some rules of law which will prevent every employment termination from being plead as a restraint of trade or commerce or as an attempt to monopolize. Having conducted the first (and so far as we know only) full dress trial of an antitrust hospital staff privilege denial case involving a board certified surgeon, *see Robinson v. Magovern,* 521 F.Supp. 842 (W.D.Pa.1981), we believe we are in a particularly good position to examine the applicability of traditional antitrust principles to a "market" very different from the usual commercial ones.

## V. *The Legal Action*

### A. *Relevant Market*

■ Before a court can evaluate the merits of a plaintiff's antitrust claims, it first must identify the market that the defendants' alleged unlawful conduct affects. This relevant market usually has two dimensions—product and geographic. Professor Lawrence Sullivan presented the following illustration of the concept of relevant market:

> To define a market in product and geographic terms is to say that if prices were appreciably raised or volume appreciably curtailed for the product within a given area while demand held constant, supply from other sources could not be expected to enter promptly enough and in large enough amounts to restore the old price or volume. If sufficient supply would promptly enter from other geographic areas, then the "defined market" is not wide enough in geographic terms; if sufficient supply would promptly enter in the form of products made by other producers which had not been included in the product market as defined, then the market would not be wide enough in defined product terms. A "relevant market," then, is the narrowest market which is wide enough so that products from adjacent areas or from other producers in the same area cannot compete on substantial parity with those included in the market.

L. Sullivan, *Handbook of the Law of Antitrust* § 12, at 41 (1977) [hereinafter referred to as *"Sullivan"*].

In *Robinson v. Magovern,* 521 F.Supp. at 877 we suggested that in the area of health care, quality might be substituted for price as a variable. We are now somewhat less certain that this substitution is particularly practical in the general medical marketplace owing to the enormous informational

difficulties presented to laymen in making qualitative distinctions among hospitals and physicians. We remain fairly confident that such comparisons can be made by physicians in referring their patients to specialists and specialized facilities, as was the case in *Robinson* and is the case here. Even so, it should be obvious that qualitative distinctions between products are much less objective and accurate than price differences between fungible products.

### 1. The Product Market

■ A properly defined product market should encompass all products—both items that are presently available and potential entrants—that have a significant, positive cross-elasticity of demand. *See Times— Picayune Publishing Co. v. United States,* 345 U.S. 594, 612 n. 31, 73 S.Ct. 872, 882 n. 31, 97 L.Ed. 1277 (1953); *SmithKline Corp. v. Eli Lilly & Co.,* 575 F.2d 1056, 1063 (3d Cir.1978). In other words, a relevant product market includes all products that consumers perceive as reasonable substitutes for each other. *See United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 394–95, 76 S.Ct. 994, 1006–07, 100 L.Ed. 1264 (1956); *Columbia Metal Culvert Company, Inc. v. Kaiser Aluminum & Chemical Corp.,* 579 F.2d 20, 26–30 (3d Cir.1978).

All parties appear to agree that the appropriate product market in the present case is thoracic and cardiovascular surgery but we believe it is appropriate to add the further adjective "pediatric" to this description. This market definition is consistent with our holding in *Robinson v. Magovern,* 521 F.Supp. at 878, that pediatric and adult open heart surgery are separate markets.

### 2. The Geographic Market

■ A court attempting to define the relevant geographic market in an antitrust case must identify the area of effective competition that the defendant encounters when it offers the designated product for sale. *See Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 331–33, 81 S.Ct. 623, 630–31, 5 L.Ed.2d 580 (1961). The area of effective competition is the territory within

which the buyer has, or in the absence of unlawful market power would have, the ability to seek alternatives if the supplier was to change one of the competitive variables to the disadvantage of consumers. *See United States v. Philadelphia National Bank,* 374 U.S. 321, 359–61, 83 S.Ct. 1715, 1739–40, 10 L.Ed.2d 915 (1963); *Weeks Dredging & Contracting, Inc. v. American Dredging Co.,* 451 F.Supp. 468, 490–92 (E.D. Pa.1978). As a corollary, the relevant geographic market is the territory within which the defendant can operate without encountering other suppliers who have the ability to compete on substantial parity. *See United States v. Aluminum Company of America,* 148 F.2d 416, 430–31 (2d Cir. 1945); *Power Replacements Corp. v. Air Preheater Company, Inc.,* 356 F.Supp. 872, 896–97 (E.D.Pa.1973); *United States v. Kimberly-Clark Corp.,* 264 F.Supp. 439, 455–59, 464 (N.D.Cal.1967). A defendant has market power if it can exclude competition from a particular territory, thus permitting it to change the competitive variables of its product without thereby causing other suppliers to enter the market. *See Sullivan* § 19, at 67. Practical commercial realities govern when defining the relevant geographic market. *Brown Shoe Co., Inc. v. United States,* 370 U.S. 294, 336, 82 S.Ct. 1502, 1529, 8 L.Ed.2d 510 (1962).

Here, all parties agree that the relevant geographical market is the "tri-state area: Pennsylvania (implicitly Western), West Virginia and Ohio (implicitly Eastern). In light of the scattered location of the other major children's hospitals in the United States, we will accept this geographic market definition.

### B. Dr. Pontius's Claims Under Section 1 of the Sherman Act

### 1. The Standard

■ Dr. Pontius asserts several claims under section 1 of the Sherman Act, 15 U.S.C. § 1. Section 1 provides in relevant part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States .... is declared

to be illegal." A literal reading of section 1 would vitiate every commercial contract that affects interstate commerce, which is a result that Congress certainly did not intend. *National Society of Professional Engineers v. United States,* 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). Therefore, the United States Supreme Court has employed a "rule of reason" standard when evaluating the legality of business relationships under section 1. *See Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49 & n. 15, 97 S.Ct. 2549, 2557 & n. 15, 53 L.Ed.2d 568 (1977). This standard forbids only unreasonable restraints of trade, which are defined generally as those activities where the anticompetitive effects outweigh the procompetitive effects. *See National Society of Professional Engineers v. United States,* 435 U.S. 679, 688–92, 98 S.Ct. 1355, 1363–65, 55 L.Ed.2d 637 (1978); *Sullivan* § 68, at 186–88, 196. Certain business combinations, however,

> because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable .... Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 210 [60 S.Ct. 811, 838, 84 L.Ed. 1129]; division of markets, *United States v. Addyston Pipe & Steel Co.,* 85 F. 271, aff'd, 175 U.S. 211 [20 S.Ct. 96, 44 L.Ed. 136]; group boycotts, *Fashion Originators' Guild v. Federal Trade Comm'n,* 312 U.S. 457 [61 S.Ct. 703, 85 L.Ed. 949]; and tying arrangements, *In-

*ternational Salt Co. v. United States,* 332 U.S. 392 [68 S.Ct. 12, 92 L.Ed. 20].

*Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Dr. Pontius asserts that the defendants' actions were *per se* unreasonable because they constituted a group boycott, unreasonably restrained trade under rule of reason analysis, or constituted an effort to exclude Dr. Pontius from an essential facility. We shall consider each claim in turn, starting with the group boycott claim.

### 2. Group Boycott

The Supreme Court has held that a *per se* violation of section 1 occurs when a manufacturer terminates its relationship with a retailer in response to a request by a group of that retailer's competitors. *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). The involvement of the competitors transforms the manufacturer's action from a possibly reasonable vertical restraint into a *per se* unlawful horizontal restraint. *See Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164, 168 (3d Cir.1979). Courts have proscribed group boycotts that are initiated by competitors at the target firm because the anticompetitive effect of excluding a firm from the market is unacceptably severe and any benefit that would result from the boycott almost always can be achieved through less restrictive means. *See Fashion Originators' Guild of America, Inc. v. Federal Trade Commission,* 312 U.S. 457, 467–68, 61 S.Ct. 703, 707–08, 85 L.Ed. 949 (1941); *Sullivan* § 85, at 240.

The availability of a *per se* theory removes from the path of a plaintiff two obstacles that would confront him if he were proceeding on a rule of reason theory. A plaintiff who can prove the existence of a group boycott can recover without establishing that the boycott actually caused any harm to the public or materially reduced competition. *See Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 213, 79 S.Ct. 705, 710, 3 L.Ed.2d 741 (1959); *Cernuto, Inc.*

*v. United Cabinet Corp.,* 595 F.2d 164, 165, 166 (3d Cir.1979). Also, if a plaintiff proves the existence of a group boycott, the court will not normally permit the defendants to justify their conduct by introducing evidence of their reasons for instituting the restraint. *See United States v. General Motors Corp.,* 384 U.S. 127, 146, 86 S.Ct. 1321, 1331, 16 L.Ed.2d 415 (1966); *Silver v. New York Stock Exchange,* 373 U.S. 341, 365, 83 S.Ct. 1246, 1261, 10 L.Ed.2d 389 (1963). Group boycotts are generally presumed to be harmful to the public and unduly restrictive.

Dr. Pontius alleges that the defendants conspired to boycott him and refused to refer patients to him. Complaint at ¶ 42, and argues that these concerted activities constitute a *per se* violation of the Sherman Act. While we have been unable to discern any evidence in the entire file suggesting the existence of a group boycott, even were we to find that Dr. Pontius had raised a genuine issue of material fact as to a group boycott, we would still find the *per se* rule inapplicable on the facts before us.

Courts consistently have stated that *per se* analysis should be employed only after the judiciary has had considerable experience with the type of business relationship in question. *See, e.g., United States v. Topco Associates, Inc.,* 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); *Harold Friedman, Inc. v. Thorofare Markets, Inc.,* 587 F.2d 127, 140–42 (3d Cir.1978). This caution results from the courts' desire to avoid prohibiting or chilling beneficial business relationships and from the courts' recognition that it is often very difficult to predict the net competitive impact of a given type of business conduct in each of the multitude of factual situations that our complex economy presents. Therefore, courts prefer to approach most cases by examining the particular circumstances and weighing all the factors under a rule of reason analysis.

Although the judiciary has had extensive experience with group boycotts, it has had few occasions to examine group boycotts in the context of the health care industry.

Moreover, as noted earlier, the Supreme Court stated in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), that

[i]t would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas.

*Id.* at 788 n. 17, 95 S.Ct. at 2013 n. 17. *Accord, National Society of Professional Engineers v. United States,* 435 U.S. 679, 696, 98 S.Ct. 1355, 1367, 55 L.Ed.2d 637 (1978) ("by their nature, professional services may differ significantly from other business services, and, accordingly, the nature of the competition in such services may vary").

The Supreme Court has undercut the implications of *Goldfarb's* footnote seventeen by its ruling in *Arizona v. Maricopa County Medical Society,* —— U.S. ——, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). After becoming aware of that decision, we deemed it of such importance, in terms of its impact on medical antitrust analysis, that we ordered counsel to submit supplemental briefs on the matter. Prior to the Supreme Court's decision, courts tended to assume that the *per se* rules would not be applied to the professions, at least until the courts built up a sufficient expertise in the area to conclude that such an application in the professional sphere made the same sort of sense that it did in the area of traditional commercial activities. *See Arizona v. Maricopa County Medical Society,* 643 F.2d 553, 557–558 (9th Cir.1980).

*Arizona v. Maricopa County Medical Society,* —— U.S. ——, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), involved an antitrust attack on a maximum fee schedule promulgated by foundations, set up by the Maricopa County Medical Society and the Pima County Medical Society. The foundations provided fee-for-service medical care in competition with existing health insurance plans. The maximum allowable fees were the result of an agreement by the foundations' member physicians. The defendants

argued that the fees had pro-competitive effects and potential public benefits in the form of cost containment. Both the district court and the Ninth Circuit Court of Appeals ruled that the novelty of the maximum fee system and the lack of experience of the courts in the medical antitrust area mandated a rule of reason approach rather than an application of the *per se* rule against price fixing. *See Arizona v. Maricopa County Medical Society*, 643 F.2d 553, 557–558.

The Supreme Court, in a four to three decision authored by Justice Stevens, reversed the Ninth Circuit, —— U.S. ——, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). Speaking in broad tones, the Court was

> unpersuaded by the argument that we should not apply the per se rule in this case because the judiciary has little antitrust experience in the health care industry. The argument quite obviously is inconsistent with *Socony-Vacuum.* In unequivocal terms, we stated that, "[w]hatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike." 310 U.S. at 222, 84 L.Ed. 1129, 60 S.Ct. 811 [843]. . . .
>
> The argument that the per se rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for per se rules, which in part is to avoid "the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken." *Northern Pac. R. Co. v. United States, supra* [, 356 U.S. 1] at 4, 2 L.Ed.2d 545, 78 S.Ct. 514 [517].

*Id.* —— U.S. at ——–——, 102 S.Ct. at 2476–77, 73 L.Ed.2d at 62–63 (footnotes omitted).

While the language employed by the Court could be read to mandate a *per se* treatment of group boycotts in the health care treatment industry, we do not believe

that such an interpretation would be correct. We note initially that the *Maricopa* Court was addressing a narrow question.

> The question presented is whether § 1 of the Sherman Act, 15 USC § 1 has been violated by an agreement among competing physicians setting, by majority vote, the maximum fees that they claim in full payment for health services provided to policyholders of specified insurance plans.

*Id.* —— U.S. at ——, 102 S.Ct. at 2469, 73 L.Ed.2d at 53.

Thus, on the facts, *Maricopa* is explicitly limited to price fixing, a commercial practice to which *per se* illegality has been found more consistently than any other type of commercial wrongdoing. See P. Areeda, *The "Rule of Reason" in Antitrust Analysis: General Issues* at 28–37. (Federal Judicial Center 1981). Furthermore, the *Maricopa* Court noted the continuing validity of the famous *Goldfarb* footnote:

> In *Goldfarb v. Virginia State Bar*, 421 US 773, 788, n. 17, 44 LEd2d 572, 95 SCt 2004 [2013, n. 17] (1975), we stated that the "public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context be treated differently." *See National Society of Professional Engineers v. United States,* 435 US 679, 696, 55 LEd2d 637, 98 SCt 1355 [1367] (1978). *The price fixing agreements in this case, however, are not premised on public service or ethical norms.* The respondents do not argue, as did the defendants in *Goldfarb* and *Professional Engineers,* that the quality of the professional service that their members provide is enhanced by the price restraint.

—— U.S. at ——–——, 102 S.Ct. at 2475–76, 73 L.Ed.2d at 61–62 (emphasis added).

In the area of physician referrals and staffing decisions it is obvious that behavior which might, in a normal commercial sphere, be considered a group boycott subject to the *per se* rules of illegality may well be dictated by "public service and ethical norms." We are simply not prepared to

hold that a group of physicians who decide that they do not want to refer patients to a particular surgeon, because they doubt his qualifications, have committed a *per se* violation of the Sherman Act. Because actions on the part of hospitals and physicians, which might resemble group boycotts, may well be mandated by an ethically grounded concern for the patients' well-being, we hold that such behavior, in the medical service industry, should be analyzed in terms of the rule of reason.

### 3. Essential Facilities Doctrine

A second *per se* theory of liability that Dr. Pontius advances arises from the essential facility doctrine. The United States Court of Appeals for the District of Columbia Circuit gave the following concise description of the essential facility doctrine in *Hecht v. Pro-Football, Inc.,* 570 F.2d 982 (D.C.Cir.1977), *cert. denied,* 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978):

> The essential facility doctrine, also called the "bottleneck principle," states that "where facilities cannot practicably be duplicated by would be competitors, those in possession of them must allow them to be shared on fair terms. It is illegal restraint of trade to foreclose the scarce facility." ... To be "essential" a facility need not be indispensable; it is sufficient if duplication of the facility would be economically infeasible [because of natural advantage, custom, or restrictions of scale] and if denial of its use inflicts a severe handicap on potential market entrants. Necessarily, this principle must be carefully delimited: the antitrust laws do not require that an essential facility be shared if such sharing would be impractical or would inhibit the defendant's ability to serve its customers adequately.

570 F.2d at 992–93 (quoting A.D. Neale, *The Antitrust Laws of the United States,* 67 (2d ed. 1970)) (footnotes omitted).

■■■ Even if we accept, without any evidence having been put forward, the proposition that Children's Hospital's thoracic and cardiovascular surgical facilities may not practically be duplicated, we believe it would be singularly inappropriate to apply a doctrine which would prevent a hospital from keeping doctors it had adjudged unqualified off of its staff. Neither public policy nor the Sherman Act can countenance such a result. Consequently we now hold that the essential facilities doctrine is inapplicable to hospital staff privileges decisions.

### 4. "Radiant Burners" Theory

Dr. Pontius has also tried to bring this case within the rule of law set forth in *Radiant Burners v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961). In *Radiant Burners* the plaintiff, a manufacturer of gas heaters, brought suit against the members of a trade association, the American Gas Association, Inc. (AGA). The AGA allegedly operated testing facilities, purportedly "to determine the safety, utility and durability of gas burners." *Id.* at 658, 81 S.Ct. at 366. Passing burners receive a seal of approval. Membership in the AGA included six of the plaintiff's competitors. The plaintiff alleged that it had twice submitted its radiant burner to the AGA for approval without success, despite the fact that its burner could meet any objective criteria of safety, efficiency and durability. Without the seal of approval, the gas company members of the AGA refused to sell gas to customers using the plaintiff's burners, effectively excluding the plaintiff's burner from the market. *Id.* at 658–659, 81 S.Ct. at 366–67.

The district court dismissed the complaint for failure to state a claim under the Sherman Act. The Court of Appeals for the Seventh Circuit affirmed. 273 F.2d 196 (7th Cir.1959). The Supreme Court reversed, holding that complaint did state a claim in the nature of a group boycott.

We do not believe that the facts of the present case justify an application of the *Radiant Burners* doctrine. We can envision medical staff decisions where the doctrine might apply. If, for example, a hospital sought to exclude all physicians who had graduated from a particular medical school,

without articulating valid medical reasons for such a policy, the *Radiant Burner* rule would probably apply and allegations of such conduct would state an antitrust claim. The rule would apply because as with gas burners, medical schools are susceptible of comparison along fairly objective criteria. If, in such a case, a hospital were unable to articulate objective reasons for its action towards applicants from the particular medical school, and representatives from competing medical schools were active in the decision, the inference of anticompetitive behavior would be fairly clear.

In the present case, however, the decision of Children's Hospital is a highly individualized personnel decision. We held in *Robinson v. Magovern* that such decisions could be properly grounded on highly subjective criteria such as the ability of the surgeon in question to work with others. 521 F.Supp. at 918. In a case where subjective rather than objective criteria dominate the approval process, the *Radiant Burner* analysis is inapplicable.

Even were we to attempt to apply the *Radiant Burner* doctrine here, the plaintiff's cause would not be materially advanced. The Court in *Radiant Heaters* did not appear to suggest that the AGA should be enjoined to certify the plaintiff's burner, rather the court suggested only that if the plaintiff's allegations proved to be correct, gas company members of the AGA could not use the lack of a seal of approval as an excuse for refusing to sell gas to purchasers of the burner. *See* 364 U.S. at 659–660, 81 S.Ct. at 367. We are unable to understand how the behavior of the Children's Hospital physicians can be analogized to that of *any* of the actors in *Radiant Burners*. Unlike the AGA, the panel at Children's Hospital which decided the fate of Dr. Pontius included none of his competitors and made its decision for legitimate reasons supported by substantial evidence. There is no actor in the present case bearing a discernable resemblance to the offending gas company in *Radiant Burner*. If a medical supplier were to refuse to sell Dr. Pontius surgical supplies on the basis of a Children's Hospital decision, a *Radiant Burner* type situation

might be presented, but such a situation is far from the facts before us. In short, the divergence between the facts here and those in *Radiant Burner* demonstrate that the rule of the latter case simply cannot be stretched to fit this case.

### 5. Rule of Reason

When performing a rule of reason analysis, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). A given restrictive practice may have both anticompetitive and procompetitive effects. In such a case, the court will find a violation of section 1 only if the anticompetitive effects predominate. *See National Society of Professional Engineers v. United States,* 435 U.S. 679, 688–89, 98 S.Ct. 1355, 1363–64, 55 L.Ed.2d 637 (1978). The plaintiff has the burden of showing the unreasonableness of the restraint. *See Sitkin Smelting & Refining Co., Inc. v. FMC Corp.,* 575 F.2d 440, 448 (3d Cir.) *cert. denied,* 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978); *United States v. Empire Gas Corp.,* 537 F.2d 296, 308 (8th Cir.1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). When proceeding on a rule of reason claim, as opposed to a *per se* claim, the plaintiff also must prove that the restraint actually harmed the public by reducing competition. *See DeVoto v. Pacific Fidelity Life Insurance Co.,* 618 F.2d 1340, 1344–45 (9th Cir.), *cert. denied,* 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980); *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164, 166 (3d Cir. 1979); *Stifel, Nicolaus & Company, Inc. v. Dain, Kalman & Quail, Inc.,* 578 F.2d 1256, 1259 (8th Cir.1978). At the summary judgment stage, this analysis must be made in a manner which gives the plaintiff the benefit of every inference which may be drawn in his favor. If genuine issues of material fact are present as to the elements of the plaintiff's antitrust claims, summary judgment is inappropriate. If, however, there

are critical factual deficiencies in some of the links in the plaintiff's chain of proof which are essential to his success on a particular claim, summary judgment will not be denied merely because he has raised a factual issue as to other essential elements of his claim.

### a. *The Decision to Terminate Dr. Pontius Staff Privilege*

 In *Robinson v. Magovern*, 521 F.Supp. 842, we conducted a bench trial of some months, following which our major conclusion as to the section 1 claims asserted by Dr. Robinson was that the hospital's decision not to grant him staff privileges was reasonable. In reaching that conclusion we acted on the implicit premise that if a hospital's stated reasons for denying the privilege did not implicate antitrust concerns and such reasons were supported by substantial evidence, no section 1 violation existed because the restraint was reasonable. *See Robinson v. Magovern*, 521 F.Supp. at 914–925. We believe this to be a proper legal rule. We do not believe that the Sherman Act prevents a hospital from discharging a physician it believes incompetent regardless of any collateral effect on "competition."

 We see no reason, however, that a court's finding of substantial evidentiary support for a hospital staff decision, taken pursuant to full procedural due process, must await trial. The question of whether the evidence before the hospital committee passing on the privilege issue is substantial or not is essentially a question of law for a reviewing court. *Cf. United States v. Bianchi & Co.*, 373 U.S. 709, 714–718, 83 S.Ct. 1409, 1413–15, 10 L.Ed.2d 652 (1963). Thus we hold that in order to withstand a summary judgment motion on section 1 claims alleged to arise out of a hospital's decision to terminate a plaintiff physician's staff privilege, the plaintiff must demonstrate on the basis of the record before the hospital at the time of its decision, that the hospital lacked substantial evidence in support of its ultimate decision. Only then will a question of fact be raised at to the reasons for the hospital's action.

 Our holding does not dispense with the need for a trial in hospital privilege cases where a genuine question of fact rather than law is presented. We do not believe, however, that the Sherman Act created the requirement of a *de novo* determination of medical staff privilege decisions by either a judge or a jury. If a hospital decides, following a hearing which meets the requirements of due process, to terminate a physician's staff privilege for reasons valid under the antitrust laws, and those reasons are supported by substantial evidence, no factual question remains as to section 1 claims—the "restraint" is a reasonable one. If, on the other hand, the hospital's decision is not supported by substantial evidence, or the procedure used to reach the decision is substantially defective, a question of fact will be presented as to the reasons for the privilege decision. It is important to note that a mere showing that the reasons advanced by the hospital are not supported by substantial evidence will not prove a plaintiff's case for him. Such a plaintiff will still have to prove that the hospital's decision was motivated by an anticompetitive reason rather than a legitimate one.

 Applying these legal principles to the facts of this case, it is apparent that the decision of Children's Hospital not to reappoint Dr. Pontius to its staff was grounded on valid reasons supported by substantial evidence.

As noted earlier, the procedures followed by Children's Hospital in reaching its decision on Dr. Pontius were quite elaborate and conformed to or exceeded the requirements of due process. The reasons for non-renewal put forward by the Credentials Committee provided the framework for the proceedings before the Ad Hoc Hearing Committee. We will assume that these reasons formed the basis for the Ad Hoc Hearing Committee's decision.

The Ad Hoc Hearing Committee received testimony at hearings open to Dr. Pontius and his lawyer, who were permitted to cross

examine witnesses. The Committee also received written evidence. The charges considered by the Committee have been noted in Part II of this opinion. We believe that any of these reasons, if substantiated would constitute a valid basis for not renewing a physician's staff privileges. Because the entire file is currently under seal in this case, pursuant to our order of February 15, 1980, we will not engage in an extensive discussion of the evidence before the Ad Hoc Hearing Committee. We have repeated the allegations of the Blue Book only because they are essential to an understanding of our opinion.

We have examined the charges and the evidence before the Ad Hoc Hearing Committee with considerable care. We believe that while there is substantial room for disagreement on inferences to be drawn from the evidence, the charges are supported by substantial evidence. We do not mean to imply by this finding that the charges are correct, only that the Ad Hoc Hearing Committee did not act arbitrarily or capriciously in accepting the charges. Consequently, the decision of Children's Hospital not to renew the staff privileges of Dr. Pontius cannot form the basis for a successful claim under section 1 of the Sherman Act.

b. *Referral Practices*

██ The essential elements of a § 1 Sherman Act claim are: (1) proof that defendants contracted, conspired or combined amongst each other; (2) that the combination produced adverse, anticompetitive effects in the relevant market; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) injury to the plaintiff. *Martin B. Glauser Dodge Co. v. Chrysler,* 570 F.2d 72, 81 (3d Cir.1977).

Dr. Pontius contends that the policy by which cases were referred by the Cardiology Division at Children's Hospital to the Surgery Department was improper and furthered the "conspiracy to restrain trade." With regard to the hospital's referral policy, the affidavit of Dr. James R. Zuberbuhler

appears to be uncontradicted. Dr. Zuberbuhler has been Director of the Cardiology Division at Children's Hospital since 1967. In his affidavit, Dr. Zuberbuhler outlined the policy by which cases were referred by the Cardiology Department to the Surgery Department during Dr. Pontius's tenure at Children's Hospital. This policy, which was established by Dr. Zuberbuhler' predecessor, Dr. Bauersfeld, and which is still followed at the present time, is as follows:

(a) Inquire of the patients if they have a preference as to the surgeon they wish to have operate on their child;

(b) Provide a list of cardiac surgeons competent to perform the particular surgery required by the child;

(c) If the parents have a choice as to the surgeon, this choice is always honored;

(d) If the parents express no choice, then the referral is made by the Cardiology Department to Dr. Henry T. Bahnson as head of the Department of Surgery. Dr. Bahnson would then make the determination as to which surgeon would perform the operations. See Zuberbuhler Affidavit at ¶ 3.

In a letter to Dr. Zuberbuhler, head of cardiology, Dr. Oliver delineated the policy on referrals involving patients with prior cardiovascular surgery:

For the record I think you should know my policy even though we have discussed it in the past. If a patient is referred by a surgeon to cardiology, the cardiologists should return the patient to the surgeon with their recommendations. 2) If a patient has previously been operated by a surgeon even though the referral is from a private pediatrician, the patient should be again referred back to the surgeon with the exception that if the parents wish to have another surgeon handle the problem, their wishes are to be honored. This assures a freedom of choice on the part of the patient and his parents. In the second situation the best way to deal with the problem (and I am sure you have been) is to ask the parents whose child you believe needs another operation something to the effect "I presume you

want Dr. X to perform this surgery again". The appropriate action can then be taken depending on the answer given by the parents.

See Appendix in Support of Plaintiff's Answer of Motions for Summary Judgment, Exhibit D.

We believe that these referral policies are, as a matter of law, reasonable restraints under the Sherman Act. There is no evidence to suggest that these referral procedures were not followed by Children's Hospital during the years in question. Dr. Pontius argues that this system seriously discriminated against him because most patients would not have a particular surgeon in mind, so the choice would tend to fall upon Dr. Bahnson, a "competitor" of Dr. Pontius who had a motive both as an individual and on behalf of Children's Hospital to refer the patients to himself or another staff surgeon not in private practice.

It is certainly true that it was in the economic interest of Children's Hospital to have operations performed by salaried staff members rather than private practitioners. It was also in the interest of those salaried staff members to keep as much of the surgical work as possible "in house" as it were. But even if we were to accept as true the plaintiff's allegations as to this theory, we do not believe that these allegations state a claim under section 1 of the Sherman Act.

The major problem with the plaintiff's claim as to the referral practices is that if true, it proves too much. He alleges, essentially, that the defendants acted as an economic entity for the provision of cardiovascular medical care and sought to maximize their profit. If this is correct, the various defendants cannot, as a matter of law have engaged in concerted action. It is well established that "[u]nilateral action, no matter what its motivation, cannot violate [section] 1." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 110 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 30 (1981). Therefore, a court may not find a section 1 violation unless it first identifies two independent economic entities that have engaged in concerted behavior. Courts consistently have held that no section 1 violation occurs when a corporation conspires with its officers, agents or employees to restrain trade. *See, e.g., Harvey v. Fearless Farris Wholesale, Inc.,* 589 F.2d 451, 455 & n. 7 (9th Cir.1979); *Goldinger v. Boron Oil Company,* 375 F.Supp. 400, 406 (W.D.Pa.1974), *aff'd mem.,* 511 F.2d 1393 (3d Cir.1975). Thus we hold that the referral practices of the defendants cannot constitute concerted action within the reach of the Sherman Act.

Our holding here is in no way inconsistent with our holding in *Robinson v. Magovern,* 521 F.Supp. at 907. In Robinson we held that Dr. McGovern's dual role at Allegheny General gave him an independent interest in the staffing question sufficient to fit within the "personal stake" exception to the general rule that no antitrust violation occurs when a corporation conspires only with its officers, agents or employees. *See, e.g., H & B Equipment Company, Inc. v. International Harvester Company,* 577 F.2d 239, 244 (5th Cir.1978); *Greenville Publishing Company, Inc. v. Daily Reflector, Inc.,* 496 F.2d 391, 399 (4th Cir.1974). Here however, the individual defendants' interests were identical with that of the Hospital since fees were essentially split on a set formula, between doctors, departments, and the Hospital generally. *See* Bahnson Deposition at 31–32. Indeed, the fee division procedure is functionally indistinguishable from the practice of a corporation assigning bonuses based on the amount of business a particular employee brings in. Such an "interest" is simply not sufficiently independent of the Hospital's interest to invoke the exception to the general rule that no concerted activity occurs when employer and employee act together.

Even if we were to treat the referral allegations of Dr. Pontius as stating a section 1 claim, that "claim" has several fatal factual deficiencies.

In the pretrial stages of *Robinson v. Magovern,* 456 F.Supp. 1000, the late Judge Snyder crystallized the issues for a case such as this:

The issues then become: (1) whether the Defendants refused to deal, and (2) if so whether their refusal was a product of anti-competitive motive.

456 F.Supp. at 1006.

The defendant physicians submitted affidavits in which each doctor denies that he ever conspired with the defendants or others to exclude Dr. Pontius from the trade of thoracic and cardiovascular surgery or limit the number of patients referred to Dr. Pontius for surgery. All the doctors further state that their support of the decision not to reappoint Dr. Pontius rested solely on the materials outlined in the Blue Book. *See* Exhibit "H."

The critical point established by these affidavits and other materials of record is that none of the four individual defendants had any possible "anti-competitive motive" for conspiring against Dr. Pontius. *See Robinson v. Magovern,* 456 F.Supp. at 1006. The affidavits of Doctors Zuberbuhler, Oliver and Baker establish that these three doctors were not competitors for thoracic and cardiovascular surgery patients of Dr. Pontius. During the period of time Dr. Pontius alleges the conspiracy took place, Dr. Oliver and Zuberbuhler did not perform thoracic and cardiovascular surgery. *See* Zuberbuhler Affidavit at ¶ 2 and Oliver Affidavit at ¶ 2. Dr. Baker left Children's Hospital in 1972 and worked *for* Dr. Pontius prior to that time. The affidavit of Glen Lanier, Associate Administrator of Children's Hospital, establishes that none of the monies received by these three doctors derived from private patient fees. *See* Lanier Affidavit at ¶¶ 3, 4 and 5. Consequently they could not have benefited in any financial way from his removal from staff. We are unable to discern any possible anti-competitive motive for their allegedly illegal conduct.

As for Dr. Bahnson, the affidavit of Philip Buchwalter, Administrator of University Surgical Associates, Inc., establishes that during the period of the alleged conspiracy, 100% of Dr. Bahnson's salary was paid by the University of Pittsburgh. Dr. Bahnson received no private fees from his surgical patients. *See* Buchwalter Affidavit at ¶ 3. This differs from Dr. Pontius's arrangements wherein he *did* receive private fees from his surgical patients. *See* Pontius Deposition at 23. Dr. Bahnson, like Dr. Pontius, is engaged in pediatric, thoracic and cardiovascular surgery. Dr. Bahnson's salary arrangement, however, eliminates any possible anti-competitive economic motive for his actions.

*Daley v. St. Agnes Hospital, Inc.,* 490 F.Supp. 1309 (E.D.Pa.1980) bears considerable resemblance to the case *sub judice.* There, a former nursing director brought suit against the hospital and its administrators alleging, in part, that they had conspired to prevent him from obtaining employment at other hospitals in violation of § 1 of the Sherman Act. There the court granted summary judgment noting that:

> In cases charging conspiracy, denial of the conspiracy by defendants' affidavit or deposition testimony is sufficient, under Rule 56(e), to shift the burden to the plaintiff to establish a factual question by the offering of evidence of the conspiracy.

*Id.* at 1317. *See also Lambs Patio Theatre, Inc. v. Universal Film Exchanges, Inc.,* 582 F.2d 1068 (7th Cir.1978) ("Facing the sworn denial of the existence of conspiracy, it was up to plaintiff to produce significant probative evidence by affidavit, or deposition that conspiracy existed, if summary judgment was to be avoided. *Id.* at 1070).

The absence of any evidence of record to rebut defendants' sworn and persuasive denials of an intent to eliminate or inhibit competition distinguishes this case from *Robinson v. Magovern,* 456 F.Supp. 1000 (W.D.Pa.1978). There, the late Judge Snyder denied motions for summary judgment because there *was* evidence of an "anti-competitive motive" amongst the defendants. In particular, the factfinder could have found that Dr. Magovern, the "senior" of Cardio-Thoracic Surgical Associates, Inc. (CTSA), had a "financial interest" in not encouraging Dr. Robinson, or any other surgeon not associated with CTSA, to apply for a staff position at Allegheny General Hospi-

tal, 456 F.Supp. at 1003. Unlike Dr. Magovern, Dr. Bahnson did not wear two conflicting hats; he did not have a private surgical practice at Children's Hospital. *See Robinson v. Magovern,* 521 F.Supp. at 907.

Finally, we believe that the decision of the Ad Hoc Hearing Committee not to renew Dr. Pontius's staff privileges, if supported by substantial evidence, insulates the individual defendants from *antitrust* liability for the resulting termination. Any other holding would chill the rights and obligations of physicians to participate in peer review. In many instances, reviewing bodies will need to rely on doctors in the same field as the physician under investigation. These doctors will in many instances be competitors. While we recognize that there is some risk that a physician might impugn the qualifications of a competitor before a credential committee or a peer review board, we have no reason to believe that the profession itself or state laws pertaining to defamation cannot adequately address this problem. Improving the process of peer review has been the objective of several state and federal laws. *See e.g.,* Professional Standards Review, 42 U.S.C. §§ 1320c–1–1320c–21 (1976 & Supp.1981); Peer Review Protection Act, 63 Pa.Stat. Ann. § 425.1 et seq. (Purdon 1982 Supp.). We doubt that peer review would be improved if the testifying physicians knew that their role in the proceedings would present them with antitrust liability. This seems to us to be a compelling instances where "[t]he public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently." *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 788–789 n. 17, 95 S.Ct. 2004, 2013–14 n. 17, 44 L.Ed.2d 572 (1975).

### C. *Dr. Pontius's Claims Under Section 2 of the Sherman Act*

Section 2 of the Sherman Act prohibits anyone from monopolizing, attempting to monopolize or conspiring to monopolize any part of interstate commerce. The plaintiff alleges that, in violation of section 2, the defendants jointly and/or severally have monopolized or have attempted to monopolize the trade of pediatric thoracic and cardiovascular surgical services in the relevant geographic market and that the defendants have conspired to monopolize the relevant product in the relevant geographic submarket.

In order to establish that a defendant has committed the offense of monopolization, the plaintiff must prove "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). A defendant possesses monopoly power if it has the ability to change the competitive variables of a product to the disadvantage of consumers without causing effective competitors to enter the relevant market. *See United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391–92, 76 S.Ct. 994, 1004–05, 100 L.Ed. 1264 (1956); *American Tobacco Co. v. United States,* 328 U.S. 781, 811, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946).

The plaintiff's complaint may also be read as alleging that Children's Hospital and the individual defendants have attempted to monopolize the delivery of pediatric cardiovascular surgery in violation of section 2 of the Sherman Act. The essential elements of an attempt to monopolize are (1) a specific intent to monopolize the relevant product and geographic markets and (2) such existing market power that there is a dangerous probability of success. *See Swift & Co. v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518 (1905). *See generally* Handles & Steuer, *Attempts to Monopolize and No-Fault Monopolization,* 129 U.Pa.L.Rev. 125 (1980).

Dr. Pontius's final section 2 theory is that the defendants conspired to monopolize the delivery of pediatric thoracic and cardiovascular surgery in the relevant geographic market in violation of section 2 of the Sherman Act. The plaintiff has the burden of producing sufficient evidence to establish that the alleged conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980).

The essential elements of a conspiracy to monopolize are (1) an agreement or understanding between two or more economic entities, (2) a specific intent to monopolize, and (3) the commission of an overt act in furtherance of the alleged conspiracy. *See, e.g., Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 709–10, 82 S.Ct. 1404, 1415–16, 8 L.Ed.2d 777 (1962); *Cullum Electric & Mechanical, Inc. v. Mechanical Contractors Association of South Carolina,* 436 F.Supp. 418, 425 (D.S.C.1976), *aff'd,* 569 F.2d 821 (4th Cir.), *cert. denied,* 439 U.S. 910, 99 S.Ct. 277, 58 L.Ed.2d 255 (1978). *Accord,* 3 J. von Kalinowski, Antitrust Laws and Trade Regulation § 9.02 (1981).

All of these section 2 claims require some showing that the defendants had an unlawful intent to monopolize. For purposes of this opinion, we will accept, at the outset, the proposition that Children's Hospital has an effective monopoly in the tri-state area on the facilities for pediatric thoracic and cardiovascular surgery. *See Robinson v. Magovern,* 521 F.Supp. at 878. There is, however, utterly no evidence that the monopoly is willful or the result of a conspiracy. We do not understand that Dr. Pontius argues to the contrary. There is no indication that Children's Hospital has made any effort to discourage competition from other hospitals in the area. Indeed its termination of Dr. Pontius's privileges is strong evidence of an intention not to monopolize, since the last thing the monopolist hospital should want is able practitioners looking for a new home in which to conduct their specialty. *See Robinson v. Magovern,* 521 F.Supp. at 891–892. Dr. Pontius does not ask us to break up the monopoly that Children's Hospital may have over the relevant market. Rather, the thrust of his prayer for relief is that he be compensated by the defendants for their refusal to let him participate in the monopoly. *See* Complaint at ¶ 68. Absent evidence of willful, illegal conduct tending to produce or perpetuate a monopoly, we do not believe that the fortuity of Children's Hospital's monopoly over pediatric thoracic and cardiovascular surgery in the tri-state area does or should mean that it cannot exercise professional judgment in passing on its staff appointments. Indeed, the fact of its monopoly might well heighten the ethical duty of the hospital to exercise particular care in selecting its staff because the patients will have no convenient alternative hospitals from which to choose. Consequently, consistent with our analysis of the plaintiff's section 1 claims, we hold that as to the hospital itself, no finding of the requisite monopolistic intent can be made when its decision not to reappoint Dr. Pontius is grounded on valid reasons supported by substantial evidence.

As to the individual defendants, none save Dr. Bahnson competed in any sense with Dr. Pontius as they are not pediatric thoracic and cardiovascular surgeons. While one can hypothesize that Dr. Bahnson might have wished to monopolize pediatric thoracic and cardiovascular surgery, despite the fact that he would not have profited directly from his monopolization, the undisputed facts preclude any finding of monopolistic behavior on his part. The record demonstrates, and the plaintiff concedes, that for many years, Dr. Pontius was the only active pediatric cardiovascular surgeon in the tri-state area. The record also shows that Dr. Pontius opposed the appointment of a competitor, Dr. Bahnson to the staff at Children's Hospital. Finally, the record demonstrates that since Dr. Bahnson became head of the Department of Surgery at the University of Pittsburgh, he has actively recruited additional pediatric thoracic

and cardiovascular surgeons to the staff of Children's Hospital. While up until 1963, Dr. Pontius was the only such surgeon active on the staff, at the time of his departure, seven other thoracic and cardiovascular surgeons were present, including two added the very year of Dr. Pontius's departure. *See* defendant, Children's Hospital's answer to Interrogatory # 68. On these facts, a monopolization claim of any sort advanced by Dr. Pontius is simply untenable. The antitrust laws protect competition, not competitors. *Brown Shoe Co., Inc. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

*Conclusion*

For the reasons we have stated we do not believe that any of the antitrust claims asserted by Dr. Pontius can withstand the defendants' motions for summary judgment. We do not mean to imply by our judgment today that Children's Hospital's reasons for not reappointing Dr. Pontius were correct or that the hospital's ultimate decision was right. We have only concluded that the hospital's reasons for its action were supported by substantial evidence and were valid under the Sherman Act. We do not believe that the antitrust laws were intended to require a judicial redetermination of such decisions.

Finally, we express no view on the merits of the state claims for which jurisdiction in this court is no longer present.

An appropriate order will issue.

ORDER OF COURT

AND NOW, to-wit, this 20th day of December, 1982, for the reasons set forth in the accompanying opinion, it is ORDERED, ADJUDGED and DECREED that the defendants' motions for summary judgment on the plaintiff's antitrust claims be, and hereby are, GRANTED, and that JUDGMENT be, and hereby is, ENTERED in favor of all defendants and against the plaintiff on all such claims.

It is FURTHER ORDERED, ADJUDGED and DECREED that the plaintiff's pendent state claims be, and hereby are, DISMISSED for lack of jurisdiction.

With the exception of the accompanying opinion and this order, which are to be available to the public, all other portions of the case file are to remain under seal pursuant to our previous order.