**Charles R. WILLMAN, M.D., Appellant,**

v.

**John DOONER, M.D., et al., Respondent.**

**No. WD 40899.**

Missouri Court of Appeals, Western District.

March 7, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 2, 1989.

Application to Transfer Denied June 13, 1989.

John C. Milholland, Harrisonville, for appellant.

Thomas G. Kokoruda, Mark A. Lynch, Kansas City, for respondent.

Before KENNEDY, C.J., and SHANGLER and GAITAN, JJ.

GAITAN, Judge.

Dr. Charles Willman, plaintiff-appellant, asserts he was libeled in connection with his 1985 application for staff privileges at Spelman Memorial Hospital in Smithville, Missouri, by defendants-respondents, John Dooner, Robert L. Corder, Jr., Randall J. Moeller, Heartland East Hospital, Roger Oskvig and Donald Frey. Dr. Willman contends that defendants sent defamatory material to Spelman, resulting in the denial of his application for privileges at Spelman. On January 29, 1988, defendants filed their Motion for Summary Judgment, asserting that no genuine issue of material fact existed with respect to Dr. Willman's allegations and that defendants were entitled to judgment as a matter of law. The trial court agreed and granted summary judgment to defendants on April 14, 1988. It is from that judgment that plaintiff presently appeals. We affirm.

Dr. Willman is no stranger to this Court. This is his fourth appearance in connection with the revocation of his hospital staff privileges at St. Joseph Hospital (now Heartland Hospital East) in St. Joseph, Missouri. *See State ex rel. Willman v. St. Joseph Hospital*, 684 S.W.2d 408 (Mo.App. 1984) (Willman I); *State ex rel. Willman v. St. Joseph Hospital*, 707 S.W.2d 828 (Mo. App.1986) *(Willman II);* and *State ex rel.*

*St. Joseph Hospital v. Fenner*, 726 S.W.2d 393 (Mo.App.1987). The facts disclose that on July 7, 1983, the Executive Committee of St. Joseph Hospital voted to revoke Dr. Willman's hospital staff privileges. The Executive Committee notified Dr. Willman that his privileges had been revoked on July 8, 1983. Pursuant to the St. Joseph Hospital bylaws, an Ad Hoc Hearing Committee, consisting of defendant doctors Dooner, Moeller, Corder, Frey and Oskvig, was appointed to hear evidence and decide whether the revocation of Dr. Willman's staff privileges should remain in effect.

On August 29 through 31, 1983, the Committee heard evidence presented by both Dr. Willman and St. Joseph Hospital. On September 6, 1983, the Committee notified St. Joseph Hospital that it had voted to affirm the revocation of Dr. Willman's staff privileges. Dr. Willman was so notified on September 12, 1983.

On October 19, 1983, the Committee transmitted a memorandum to the hospital entitled, "Ad Hoc Hearing Committee's Memorandum to the St. Joseph Hospital Governing Body" (Memorandum). The Memorandum was prepared by the Committee to explain the reasons of its conclusion that the revocation of Dr. Willman's privileges should stand.

At some time prior to March 19, 1985, Dr. Willman applied for staff privileges at Spelman Memorial Hospital in Smithville, Missouri. As a part of that application, Dr. Willman signed a "Privilege Request Form and Release of Information" (Release). The Release stated in relevant part:

> By applying for appointment to the medical staff I hereby signify my willingness to appear for the interviews in regard to my application, authorize the hospital, its medical staff and their representatives to consult with administrators and members of medical staffs of other hospitals or institutions with which I have been associated and with others, including past and present malpractice carriers, who may have information bearing on my professional competence, character and ethical qualifications. *I hereby consent to the inspection by the hospital, its medi-cal staff and its representatives of all records and documents, including medical records, at other hospitals, that may be material to an evaluation of my professional qualifications and competence to carry out the clinical privileges requested as well as my moral and ethical qualifications for staff membership.* I hereby release from liability all representatives of the hospital and its medical staff for their acts performed in good faith and without malice in connection with evaluating my application and my credentials and qualifications, and I hereby release from any liability any and all individuals and organizations who provide information to the hospital, or its medical staff, in good faith and without malice concerning my professional competence, ethics, character and other qualifications for staff appointment and clinical privileges, *and I hereby consent to the release of such information.* [Emphasis added.]

On March 19, 1985, in the course of Spelman's investigation into Dr. Willman's application for staff privileges, a representative of Spelman wrote to the medical staff of St. Joseph Hospital requesting information about the status of Dr. Willman's privileges at St. Joseph Hospital. The letter specifically asked St. Joseph to verify that Dr. Willman had been a member of the St. Joseph Hospital medical staff and whether his privileges had been revoked or limited in any way. Following a reply from St. Joseph Hospital on May 6, 1985, the Chief Executive Officer at Spelman, in a letter dated June 3, 1985, wrote to the Chairman of the Credentials Committee at St. Joseph Hospital specifically requesting the reasons why Dr. Willman's privileges were revoked. On August 10, 1985, St. Joseph Hospital, independent of the other defendants responded by providing Spelman Memorial Hospital a copy of the Memorandum of October 19, 1983.

While Dr. Willman has asserted numerous points on appeal, the real determinative issues are: (1) whether the statements made by the Ad Hoc Committee and contained in the Memorandum are ones of fact

or opinion; and (2) whether the statements were made in good faith and therefore, protected by the release appellant signed authorizing release of information pertinent to his professional competency.

## I.

■ Dr. Willman first argues that the statements in the Memorandum are libelous per se. A libel is actionable per se only if, on its face, without resort to extrinsic facts, it is injurious to the plaintiff's reputation. *Langworthy v. Pulitzer Publishing Co.*, 368 S.W.2d 385, 388 (Mo.1963); *Buller v. Pulitzer Publishing Co.*, 684 S.W.2d 473, 477 (Mo.App.1984). Importantly, language is not libelous per se if it requires innuendo in order for the language to become libelous. *Langworthy*, 368 S.W.2d at 388–89.

■ Statements of opinion are absolutely privileged. *Henry v. Halliburton*, 690 S.W.2d 775, 786–87 (Mo. banc 1985). The opinion/fact distinction is a question of law to be decided by the trial judge. *Id.* at 789. Consequently, we must determine whether the statements allegedly made by the defendants were facts or opinions. Dr. Willman argues that the trial court ignored, misapplied, or misinterpreted *Halliburton* in determining that the alleged defamatory statements were opinions. A careful analysis of *Halliburton* shows Dr. Willman's argument to be without merit.

The operative holding of *Halliburton* is that the opinion/fact distinction must be made by looking at the totality of the circumstances surrounding the alleged libelous statements. *Id.* at 788. The Court also stated that the totality of the circumstances approach "includes *but is not limited to* those factors discussed by both Judge Starr and the Ninth Circuit in *Information Control Corp. [v. Genesis One Computer Corp.*, 611 F.2d 781 (9th Cir. 1980)] supra." *Id.* (Emphasis added).

The *Halliburton* court intended the totality of the circumstances analysis to be much broader than Dr. Willman suggests. The court employed a much more subjective approach, considering factors such as the context in which the alleged defamatory language appeared. *Id.* at 790. Additionally, the court considered the legal principle that "individuals may use pejorative or vituperative language when referring to another as long as they do not suggest specific criminal conduct." *Id.* It was with that background that the *Halliburton* court found that the alleged defamatory statements were opinions and, thus, not actionable.

■ In the case at bar, the trial court correctly concluded that each of the alleged defamatory statements was a statement of opinion. This committee was not out on a witch hunt. They picked Dr. Willman for good reasons. An analysis of the language of the Memorandum shows that Dr. Willman's 1982 patient readmission rate was 12.9 percent. The next highest rate for a general surgeon was 2.7 percent.

The Ad Hoc Hearing Committee attempted to review Dr. Willman's performance using objective criteria. They relied upon a current standard textbook on surgical practice to define the principles of a general surgical practice. They also reviewed patient charts to determine if any practice fell below the standard of acceptable medical practice. Additionally, the Committee used its collective experiences as medical practitioners to define what was good medical practice irrespective of the specialty involved. It should be noted that the only surgeon on this Committee, Dr. Edward Andres, disqualified himself after appellant claimed he could not be unbiased because they are competing for business. Apparently, Dr. Andres wanted to avoid the appearance of bias. Even after Dr. Andres was dismissed from this Committee, Dr. Willman still challenged the composition of the Committee as being against the hospital bylaws. This issue was disposed of in *Willman I* where this Court concluded that the hospital bylaws had been complied with, except for one deviation which was of no consequence here. *Id.* at 412.

The Memorandum, at issue, is divided into five main sections. Of the five, only Sections II and III contain statements which Dr. Willman alleges to be defam-

atory. Both sections are discussed separately.

Section II of the Memorandum, entitled "Chart Evidence of Substandard Medical Care," is a discussion of three patient charts which the Committee felt to be particularly egregious and contrary to a basic standard of medical care. The comments in the Memorandum are identical to the situation in which a physician, as an expert witness at a medical malpractice trial, testifies that the defendant physician's care was substandard. Such testimony is always presented as the opinion of the expert witness. In a similar vein, Missouri courts have long recognized that "[t]he making of a diagnosis is largely a matter of judgment," as is the choice of treatment for a particular patient. *Williams v. Chamberlain*, 316 S.W.2d 505, 512 (Mo.1958); *see also Fisher v. Wilkinson*, 382 S.W.2d 627, 632 (Mo.1964). It follows that a physician's judgment as to the quality of another physician's medical care is an opinion.

Further review of Section II confirms the alleged defamatory statements to be the opinions of the drafters of the Memorandum. In the subsection entitled "Surgical Practice," the Committee, after reviewing the facts involved, concluded that the patient could have been better treated by a two-stage operation rather than by five different procedures. The Committee also remarked that the multiple procedures constituted unnecessary surgery.

The remaining subsections of Section II contain similar comments. Whether a sonogram would have been preferable to a pregnancy test in the second patient is a matter of medical judgment, as is the question of whether the afterbirth of the infant was left in the patient's uterus and was the most likely cause of the infections. Likewise, whether a patient's diabetic acidosis is severe and the treatment of it suboptimal is a matter of medical opinion. Thus, each of the alleged defamatory statements in Section II of the Memorandum are opinions protected by the absolute privilege.

Section III of the Memorandum is entitled "Substandard Adherence to Basic Principles of Good Medical Practice." The Committee set forth six areas that it believed essential to good medical practice irrespective of the specialty. These areas were: (1) adequate history and physical exam to delineate the medical problem for which the patient presents himself for treatment; (2) a logical approach to the differential diagnosis of the disease that causes the original complaint(s); (3) recognition of significant changes in the physical status or laboratory data of the patient as the diagnosis or treatment process takes place; (4) approximate and timely responses to the recognition of these changes in physical status or lab values; (5) appropriate use of therapeutic modalities (including surgical procedures); and (6) recognition of problems for which consultation is needed.

As it relates to the above referenced areas, the Committee found Dr. Willman's medical practice lacking in the following respects: (1) inadequate history and physical exam, (2) failure to recognize significant changes in physical status and/or laboratory data; (3) inadequate or untimely responses to the recognition of significant changes in physical status and/or laboratory data; and (4) failure to recognize problems for which consultation is needed. In the context of physician review of another physician's medical practice, such terms are the hallmark of a physician's medical opinion.

The remainder of the Committee's language in Section III must be considered in light of the foregoing. As the Memorandum states, these statements are a list of examples of deficiencies in Dr. Willman's medical care in the six above-mentioned categories. For example, the statement "No system review or urologic history was done of Mrs. (*name omitted*) to determine why she was scheduled for a vaginal repair based upon minimal physical findings" falls under the heading "Inadeuate (sic) History and Physical Exam." Clearly, the language taken as a whole indicates that the Committee believed Dr. Willman's action to be *inadequate*. Such is a matter of medical opinion. The same can be said with regard to the remaining statements in the memorandum when looked at under the

totality of circumstances analysis. As the lone example of a statement of fact, Dr. Willman quotes the statement "Congestive heart failure was treated with saline enemas during hospitalization" from page 13 of the Memorandum. Dr. Willman argues that, as this statement is capable of being understood as a statement of fact, summary judgment was inappropriate. However, Dr. Willman ignores the context in which the statement was made. He even contends, erroneously, that the immediate context of the statement is irrelevant. However, the totality of the circumstances analysis demands that the context of the statement be considered. When considered in the context of the heading under which the statement appears, "Uses Therapeutic Modalities Inappropriately," it is obvious that the Committee was not merely stating a fact but, rather, expressing the opinion that giving a saline enema to a patient with congestive heart failure was *inappropriate*. Such is not a readily verifiable fact because the appropriateness or inappropriateness of various treatments is a matter of opinion. Dr. Willman's argument is, therefore, without merit. In addition, each example is modified by the heading under which it appears, and each heading strongly shows the Committee's intent to express its opinion with respect to each of the examples. Thus, the trial court's finding that the alleged defamatory statements were opinions was correct.

If Dr. Willman's argument was permitted, hospitals would have no way of monitoring the medical practices of its physicians and maintaining the highest degree of medical competency. Summary judgment was, therefore, appropriate. As this Court noted in *Snowden v. Northwest Missouri State University*, 624 S.W.2d 161, 165 (Mo.App.1981), if a summary judgment is sustainable on any theory, the judgment must be sustained. *See also Flanary v. Rowlett*, 612 S.W.2d 47 (Mo.App.1981); *City of Kirkwood v. City of Sunset Hills*, 589 S.W.2d 31 (Mo.App.1979).

## II.

■ Normally, any publication made with the consent of the plaintiff is absolute-

ly privileged. *Ramacciotti v. Zinn*, 550 S.W.2d 217, 224 (Mo.App.1977). This privilege remains absolute even if the statements made are false, *Westbrook v. Mack*, 575 S.W.2d 921, 924 (Mo.App.1978), and even if they were made with actual malice. *Williams v. School District of Springfield R–12*, 447 S.W.2d 256, 267 (Mo.1969); *Johnson v. City of Buckner*, 610 S.W.2d 406, 411 (Mo.App.1980). The rationale for this privilege is self-evident: one cannot invite the publication of material and then complain of the resulting damage.

■ Although releases of the type signed by Dr. Willman normally entitle the defendants to an absolute privilege, the trial court correctly found that Dr. Willman's Release entitled defendants only to a *de facto* qualified privilege. Specifically, the court stated that, because of the language "in good faith and without malice" in the Release, the statements in the Memorandum were privileged only to the extent that they were made in good faith and without malice.

■ The only evidence before the trial court in connection with defendants' Motion for Summary Judgment unequivocally proved that, in drafting the Memorandum, the defendant physicians believed each of the statements made in the Memorandum, in their medical opinion, to be true. Notwithstanding Dr. Willman's assertions to the contrary, the evidence proved that the defendants bore no malice to Dr. Willman and drafted the Memorandum in good faith.

Summary judgment shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with affidavits, if any, show that no genuine issue of material fact exists and that a party is entitled to judgment as a matter of law. Rule 74.04(c); *Crain v. Missouri Pacific Railroad*, 640 S.W.2d 533 (Mo.App.1982).

Dr. Willman offered no evidence of malice in response to defendants' evidence on their Motion for Summary Judgment. When confronted with evidence on a motion for summary judgment, the opposing party may not simply rest upon his pleadings in

order to create an issue of material fact, but he must offer his own affidavits and other evidence to show that there is a genuine issue for trial, or summary judgment may be entered against him. *See Cherry v. City of Hayti Heights*, 563 S.W.2d 72, 75 (Mo. banc 1978).

In a defamation case in which a qualified privilege is applicable, the plaintiff must prove specific facts which demonstrate the presence of express malice. *Snowden*, 624 S.W.2d at 169. Because Dr. Willman failed to prove, or even plead, specific facts suggesting the presence of malice, no genuine issue of material fact is present as to its existence. The trial court was, therefore, justified in entering summary judgment for defendants. Actual malice is defined as actual knowledge of the falsity of the statements or reckless disregard for the truth in making the statements. *Smith v. UAW–CIO Federal Credit Union*, 728 S.W.2d 679, 683 (Mo.App.1987). The Memorandum itself indicates that defendant physicians spent well over 250 hours reviewing the evidence presented at the hearing in August 1983. The undisputed evidence also indicates that defendant physicians, believing the statements to be true, drafted the Memorandum in good faith and without malice. If the alleged defamatory statements were originally drafted in good faith and without malice, it does not follow, without further proof, that the statements could be later published with malice. Dr. Willman presented no evidence that, between the drafting and the publishing of the Memorandum, any of the defendants changed their opinion about their belief in the truth of the statements contained in the Memorandum.

The trial court correctly found that, based upon the only evidence before it on the motion for summary judgment, the alleged defamatory statements were made in good faith and without malice. The court correctly awarded summary judgment to the defendants on the basis of a qualified privilege for the statements Dr. Willman invited by signing the Release.

## III.

When considering Dr. Willman's application for staff privileges, Spelman Memorial Hospital, in a letter dated July 3, 1985, specifically requested information regarding why Dr. Willman's privileges had been revoked at St. Joseph Hospital. Clearly, Spelman had a legitimate interest in obtaining this information to ensure that it granted staff privileges only to competent, well-qualified physicians.

Providing information at the request of the recipient in order to protect an interest of the recipient establishes a qualified privilege. *Halliburton*, 690 S.W.2d at 781. In *Halliburton*, two of plaintiff's customers asked defendant for copies of an article written by defendant, in which defendant called the plaintiff a "fraud and a twister" and accused him of acting with "greed" and of "fleecing a consumer." The Missouri Supreme Court held that, under those circumstances, where defendants furnished a copy of the article in response to an unsolicited request, defendant was entitled to a qualified privilege. *Id.*

The facts of the case at bar are nearly identical to the facts of *Halliburton*. Like the article in *Halliburton*, the Memorandum in the present case was furnished to Spelman Memorial Hospital in response to an unsolicited, specific request. Therefore, the alleged defamatory statements in the Memorandum are protected by a qualified privilege.

Once such a privilege is found to exist, the burden is upon the plaintiff to prove express common law malice, the only thing that will defeat such a qualified privilege. *Id.* Dr. Willman's argument that he has no burden to prove malice to defeat the qualified privilege is erroneous. *Halliburton* states that "these other qualified privileges can be defeated upon a showing of express common law malice." *Id.* To argue that a defendant must prove lack of malice is complete contrary to the express language of *Halliburton*. Thus, Dr. Willman must prove actual malice in order to overcome this qualified privilege.

## IV.

█ Publication is an essential element of actionable defamation. *Tucker v. Delmar Cleaners, Inc.*, 637 S.W.2d 222, 224 (Mo.App.1982); *Ellis v. Jewish Hospital of St. Louis*, 581 S.W.2d 850, 851 (Mo.App. 1979). Publication requires a showing that the defendant delivered or caused to be delivered the allegedly libelous material to a third person. *Tucker*, 637 S.W.2d at 224.

█ The defendant doctors cannot be liable for any publication "which resulted from the independent or unauthorized acts of others into whose hands the statement came in processing the charges in the manner contemplated by the constitution and bylaws." *Pulliam v. Bond*, 406 S.W.2d 635, 643 (Mo.1966).

In *Willman I*, this Court traced the steps by which Dr. Willman's staff privileges were revoked. The Memorandum was delivered to the Board of Directors' Appellate Review Committee, which affirmed the decision to revoke Dr. Willman's staff privileges. That first dissemination of the report, within the hospital, was clearly privileged. *See Snowden*, 624 S.W.2d at 168. The Memorandum was also processed in accordance with the hospital bylaws.

The facts of *Pulliam* are on all fours with the facts of the present case. In *Pulliam*, plaintiff and defendant were union officials. Plaintiff was charged with misconduct in his official capacity, and a statement of those charges was prepared by the Executive Committee and delivered to the Joint Protective Board of the union. The court held that, by accepting membership in the union, plaintiff had consented to having written charges filed and processed pursuant to the organization's constitution and bylaws. *Id.* at 641. Because the original publication was privileged, defendants in the case at bar could not be held liable for any subsequent unauthorized republication.

## V.

█ In his Amended Petition, Dr. Willman has made numerous allegations that defendant St. Joseph Hospital failed to comply with its bylaws in revoking his staff privileges in 1983. Dr. Willman also alleges that the hearing process involving his staff privileges was unfair because the Ad Hoc Hearing Committee was invalid and without authority to act on the subject of his staff privileges.

Dr. Willman's procedural allegations are barred by collateral estoppel. On November 17, 1983, Dr. Willman filed a mandamus action in the Circuit Court of Buchanan County, Case No. CV383–1239CC, alleging that St. Joseph Hospital, had violated its bylaws in revoking his staff privileges on June 3, 1983. In *State ex rel. Willman v. St. Joseph Hospital*, 684 S.W.2d 408 (Mo.App.1984) (*Willman I*), this Court examined the hospital's compliance with its bylaws and clearly held that, except for one insignificant deviation, the hospital had followed its bylaws and had afforded Dr. Willman a fair hearing prior to revoking his privileges. "We hold that Dr. Willman was afforded the procedures provided for in the corporate and medical staff bylaws that the only deviation from those bylaws was of no consequence." *Willman I*, 684 S.W.2d at 412.

This Court twice reaffirmed *Willman I* in *State ex rel. Willman v. St. Joseph Hospital*, 707 S.W.2d 828 (Mo.App.1986) (*Willman II*), and *State ex rel. St. Joseph Hospital v. Fenner*, 726 S.W.2d 393 (Mo. App.1987). The Circuit Court of Buchanan County dismissed Dr. Willman's mandamus action with prejudice on June 2, 1987.

Facts once judicially determined may not again be litigated in a subsequent action, regardless of whether the subsequent action involves the same or a different cause of action, subject matter, claim or demand in the earlier action. *Moreland v. State Farm Fire and Casualty Co.*, 662 S.W.2d 556, 567–68 (Mo.App.1983).

In the present case, Dr. Willman's procedural allegations in his Amended Petition are identical to those he made in his original Petition in Mandamus, and in his Amended Petition in Mandamus. This Court has already adjudicated these procedural allegations in the earlier mandamus action, forever barring them from relit-

igation. The trial court was correct in granting summary judgment to defendants as to these allegations.

The judgment of the trial court is affirmed.

All concur.