**Charles R. WILLMAN, M.D., Plaintiff,**

v.

**HEARTLAND HOSPITAL EAST, et al., Defendants.**

No. 89–0785–CV–W–9.

United States District Court, W.D. Missouri, W.D.

Oct. 19, 1993.

George M. Bock, Slagle, Bernard & Gorman, Kansas City, MO, David W. Harlan, Gallop, Johnson & Neuman, St. Louis, MO, Julian O. Von Kalinowski, Gibson, Dunn & Crutcher, Los Angeles, CA, J. Bennett Clark, Senniger, Powers, Leavitt & Roedel, St. Louis, MO, for plaintiff.

Thomas G. Kokoruda, George E. Leonard, Shughart, Thomson & Kilroy, Kansas City, MO, for defendants Heartland Hosp. East, Heartland Hosp. West and Heartland Health System, Inc.

R. Dan Boulware, Watkins, Boulware, Lucas, Miner, Murphy & Taylor, St. Joseph, MO, for defendants Richard Craig, Ernest Weinand, M.D., Edward Andres, M.D., James McMillen, M.D., Orlyn Lockard Jr., M.D., Charles Mullican, M.D. and Wallace McDonald, M.D.

Matthew R. Davis, Reed O. Gentry, Field, Gentry & Benjamin, P.C., Kansas City, MO, R. Dan Boulware, Michael L. Taylor, Watkins, Boulware, Lucas, Miner, Murphy & Taylor, St. Joseph, MO, for defendant Edward Beheler, M.D.

R. Dan Boulware, Mark R. Woodbury, Michael L. Taylor, Watkins, Boulware, Lucas, Miner, Murphy & Taylor, St. Joseph, MO, for defendant Robert Stuber, M.D.

### ORDER

BARTLETT, District Judge.

Alleging a *per se* violation of the Sherman Anti-trust Act, 15 U.S.C. § 1 (Count I), restraint of trade in violation of the Sherman Anti-trust Act, 15 U.S.C. § 1 (Count II), monopoly leveraging and abuse of an essential facility in violation of the Sherman Anti-trust Act, 15 U.S.C. § 2 (Count III) and intentional interference with business expectancy (Count IV), plaintiff Charles R. Willman seeks reinstatement of his admission privileges at defendant hospitals, costs of litigation, attorney fees and damages. Defendants Heartland Health Systems, Heartland Hospital East and Heartland Hospital West (hereafter "the defendant hospitals") and Richard Craig, Ernest Weinand, Edward Beheler, Edward Andres, Steven Krueger, James McMillen, Robert Stuber, Orlyn Lockard, Charles Mullican and Wallace McDonald (hereafter "defendant doctors") move for summary judgment on Counts I, II, III and IV of the Complaint.

In addition to denying the claims asserted by plaintiff, defendants have asserted a Counterclaim against plaintiff for abuse of process and malicious prosecution. Plaintiff moves for summary judgment against defendants on the Counterclaim.

### I. Facts

Plaintiff Dr. Charles Willman began practicing medicine in St. Joseph in 1959. Plaintiff practiced general surgery and provided general medical services in Buchanan County, Missouri, and surrounding areas. Willman had endoscopy facilities in his office and planned to construct a one-day surgical center. Defendant hospitals also had endoscopy facilities.

Defendant Heartland Hospital East is a Missouri Corporation. Prior to June 26, 1985, it operated under the name St. Joseph Hospital. Defendant Heartland Hospital West is also a Missouri corporation. Prior to June 26, 1985, it operated under the name Methodist Medical Center. In 1983 the Hospitals created a corporation, Heartland Health Affiliates, to coordinate the operation and services of the hospitals. Defendant Heartland Health System, Inc. is the successor to Heartland Health Affiliates.

Defendant Richard Craig, M.D. practices general surgery. Craig was Chief of the Department of Surgery at Methodist Hospital and was a member of the Executive Committee.

Defendant Ernest Weinand, M.D. practices general surgery. Weinand was a member of Methodist's credentials Committee and of St. Joseph's Executive Committee.

Defendant Edward Beheler, M.D. practices general surgery. Beheler was a member of Methodist's Critical Care Committee, Methodist's Board of Trustees and of St. Joseph's Executive, Credentials and Critical Care Committees.

Defendant Edward Andres, M.D. practices General Surgery. He was a member of St. Joseph's Critical Care, Ad Hoc and Credentials Committees.

Defendant Steven Krueger, M.D. practices primary care/internal medicine. He was a member of Methodist's Credentials and Critical Care Committees and of St. Joseph's Executive, Credentials and Critical Care Committees.

Defendant James McMillen, M.D. practices primary care/internal medicine. He was a member of Methodist's Executive and Credentials Committees and was President of General Staff at Methodist. McMillen also participated in proceedings before the St. Joseph Hospital Board of Trustees.

Defendant Robert Stuber, M.D. practices internal medicine/primary care. He was a member of Methodist's Critical Care and Executive Committees and the Board of Directors of St. Joseph Hospital.

Defendant Orlyn Lockard, M.D. practices endoscopy. He was a member of Methodist's and St. Joseph's Executive Committee. He was also President of the General Staff at St. Joseph's.

Defendant Charles Mullican, M.D. practices primary care/internal medicine. He was a member of Methodist's Executive and Critical Care Committees and of St. Joseph's Executive Committee.

Defendant Wallace McDonald, M.D. practices primary care/internal medicine. He was a member of Methodist's Executive Committee.

In February 1982, the Critical Care Committee of Methodist Hospital reviewed Willman's care of patient Bobby Fanning. After this review, Willman's privileges were limited by adding a consultation requirement. Willman's privileges were suspended at Methodist Hospital in February 1983. A hearing was held in June 1983, that resulted in a recommendation to the Board of Trustees at Methodist to revoke Willman's privileges. The Board suspended his privileges in July 1983. The Board denied Willman's reapplication for privileges in 1984 and a new application for privileges in 1986.

St. Joseph Hospital reviewed the Fanning case in 1983. In May 1983, the Credentials Committee recommended revocation of Willman's privileges and the recommendation was approved by the executive committee in June 1983. The Board of Trustees voted to revoke Willman's privileges. At Willman's request, the Circuit Court of Buchanan County in 1983 issued a writ of mandamus requiring St. Joseph Hospital to restore his privileges. Willman practiced general surgery at St. Joseph Hospital for slightly less than 15 months, until the writ was dissolved in 1985. St. Joseph Hospital denied Willman's 1985 application for privileges for the year 1986.

In 1983 or 1984, Willman applied for privileges at Atchison Hospital, but was told that he should consider withdrawing his application because of the suspension of privileges at Methodist and St. Joseph Hospitals.

Willman applied for privileges at Spelman Memorial Hospital in 1985 and his application was rejected after Spelman received a copy of the Ad Hoc committee report dated October 19, 1983, from St. Joseph Hospital.

Willman's malpractice insurance with Momedico was cancelled in July 1982. Willman was insured by St. Paul Fire & Marine from 1982 to August 17, 1985. St. Paul cancelled Willman's insurance because his privileges had been suspended at Methodist and St. Joseph Hospitals.

II. *Standard for Summary Judgment*

Rule 56(c), Federal Rules of Civil Procedure, provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, it is the court's obligation to view the facts in the light most favorable to the adverse party and to allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Inland Oil and Transport Co. v. United States,* 600 F.2d 725, 727–

28 (8th Cir.), *cert. denied,* 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420, (1979).

If there is no genuine issue about any material fact, summary judgment is proper because it avoids needless and costly litigation and promotes judicial efficiency. *Roberts v. Browning,* 610 F.2d 528, 531 (8th Cir.1979); *United States v. Porter,* 581 F.2d 698, 703 (8th Cir.1978). The summary judgment procedure is not a "disfavored procedural shortcut." Rather, it is "an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986); *see also City of Mt. Pleasant v. Associated Electric Cooperative, Inc.,* 838 F.2d 268, 273 (8th Cir.1988). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish that there is a genuine issue for trial about an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553.

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, the *absence* of genuine issues of material fact. However, the moving party *is not required* to support its motion with affidavits or other similar materials *negating* the opponent's claim. *Id.* (emphasis added).

The nonmoving party is then required to go beyond the pleadings and by affidavits, depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* A party opposing a properly supported motion for summary judgment cannot simply rest on allegations and denials in his pleading to get to a jury without any significant probative evidence tending to support the complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The evidence favoring the nonmoving party must be more than "merely colorable." *Id.* 477 U.S. at 249, 106 S.Ct. at 2511. When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted).

The inquiry to be made mirrors the standard for a directed verdict: whether the evidence presented by the party with the onus of proof is sufficient that a jury could properly proceed to return a verdict for that party. *Anderson v. Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2511.

In applying these rules to a case brought under 15 U.S.C. § 1, the Sherman Anti-trust Act, the Eighth Circuit Court of Appeals cautions that "[b]ecause a fine line separates unlawful concerted action from legitimate business practices, an antitrust conspiracy cannot be inferred from 'highly ambiguous evidence.'" *Lovett v. General Motors Corp.,* 998 F.2d 575, 577 (1993), (quoting *Monsanto v. Spray–Rite Service Corp.,* 465 U.S. 752, 763, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). "Conduct that is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* Essentially, the question in ruling on a motion for summary judgment and on a motion for directed verdict is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* 477 U.S. at 251, 106 S.Ct. at 2512.

### III. *Discussion*

#### A. *Counts I and II*

In Counts I and II of the Complaint, plaintiff alleges violations of 15 U.S.C. § 1, the Sherman Anti-trust Act. The essential elements of a claim under § 1 of the Sherman Act are:

1) a contract, combination or conspiracy;

2) affecting interstate commerce;

3) which imposes an unreasonable restraint of trade.

*White & White, Inc. v. American Hosp. Supply Corp.,* 723 F.2d 495 (6th Cir.1983) (citations omitted).

In Count I of the Complaint, plaintiff alleges a *per se* violation of the Sherman Act, 15 U.S.C. § 1. "No court has applied a *per se* rule when an individual has been denied privileges." Julian O. von Kalinowski, 6 *Antitrust Laws and Trade Regulations* § 52.03[1] (1992). In *Flegel v. Christian Hospital Northeast–Northwest*, 4 F.3d 682 (8th Cir. 1993), the plaintiff, an osteopath, alleged that a hospital and doctors from the medical staff conspired with one another to boycott the plaintiff from obtaining privileges in violation of Section 1 of the Sherman Act. The Eighth Circuit Court of Appeals held that a *per se* analysis was not applicable to a medical staff privilege case because "[t]he exclusion from staff privilege in this case arguably falls within the category ... 'industry self regulation' and is consequently not appropriate for per se analysis." *Id.* at 687 (citing *Weiss v. New York Hospital*, 745 F.2d 786 (3d Cir.1984).

■ Similarly, in this case industry self-regulation is involved because Willman was excluded from staff privileges as the result of peer review. Therefore, plaintiff's *per se* theory must fail. Summary judgment will be granted to all defendants on Count I, the claim for a *per se* violation of the Sherman Anti-trust Act.

■ Even if a *per se* claim were available in a case involving exclusion from the medical staff of a hospital, summary judgment on Counts I and II would be granted because Willman has failed to present facts from which a reasonable jury could conclude that a contract, combination or conspiracy existed. Therefore, plaintiff has not demonstrated that he can satisfy the first element of a § 1 claim.

Willman alleges that some of the doctors on the medical staff both conspired among themselves and with the defendant hospitals to revoke his hospital privileges and to deny his reapplication for privileges in violation of 15 U.S.C. § 1. In order to satisfy the first element of a § 1 claim, there must be a conspiracy "between *separate* entities. It [the Sherman Act] does not reach conduct that is 'wholly unilateral.'" *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628

(1984) (emphasis in original). "Independent action is not proscribed." *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984).

The Eighth Circuit Court of Appeals has not yet determined whether a hospital can conspire with its medical staff. *Flegel v. Christian Hospital Northeast–Northwest*, 4 F.3d 682, 685 n. 3 (8th Cir.1993). There is a split among the Circuits on whether a hospital is capable of conspiring with its medical staff to violate antitrust laws. *See* cases cited in *Flegel*, 4 F.3d at 685 n. 3. I believe that the better-reasoned decisions recognize that the intracorporate immunity doctrine applies to peer review proceedings.

For instance, in *Oksanen v. Page Memorial Hospital*, 945 F.2d 696, 703 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992), the plaintiff contended that during the peer review process the medical staff conspired with the hospital and members of the medical staff conspired among themselves to revoke his hospital privileges. Based on the principle of inter-corporate immunity articulated in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), *Oksanen*, held that the staff is incapable of conspiring with the hospital.

> In effect, the medical staff was working as the Board's agent under an 'internal agreement to implement a single unitary firm's policies' of evaluating the conduct and competence of those to whom the hospital extended privileges.

> This type of delegation of authority does not implicate the concerns of section one of the Sherman Act. The decision to conduct the peer review process does not represent the sudden joining of independent economic forces that section one is designed to deter and penalize. '[T]here are not strong anti-trust concerns that would warrant a departure from the traditional concepts of agency since the hospital and medical staff are not competitors.' Far from being a competitor with the hospital, the medical staff was in fact a natural component of the hospitals management structure.

*Id.* at 703 (quoting *Nurse Midwifery Assoc. v. Hibbett,* 918 F.2d 605 (6th Cir.1990).

Plaintiff responds relying on *Steele v. Armour & Co.,* 583 F.2d 393, 398 (8th Cir. 1978). Plaintiff argues that an agency relationship does not arise solely because the hospitals controlled the final decision.

"A principal/agent relationship is established by showing manifestation of consent by one person to another that the other shall act on his own behalf, and subject to his control, and consent by the others so to act." *Montague v. Heater,* 836 F.2d 422, 424 n. 3 (8th Cir.1988) (citing *Leidy v. Taliaferro,* 260 S.W.2d 504, 505 (Mo.1953)). In other words, "[t]he principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on the principal's behalf and subject to his control." Restatement of Agency 2d § 1 cmt. a. (1958).

Here, the hospital boards delegated to the medical staff the responsibility for conducting the initial peer review pursuant to a procedure adopted by each Board. After the medical staff performed its part of peer review, the board of each hospital made the final decision with regard to staff privileges. In the peer review process, the staffs participating in the hospitals' peer review procedures were acting as agents of the hospitals. As stated in *Oksanen,* "[t]his type of delegation of authority does not implicate the concerns of section one of the Sherman Act." *Oksanen,* 945 F.2d at 703.

Plaintiff argues that, even if the medical staffs were agents of the hospitals, the "personal stake" exception to intercorporate immunity applies because the staff doctors conducting the peer review were competitors of the plaintiff. Of the approximately 65 doctors who participated in the peer review process at the hospitals, 43 practiced either general surgery, primary care/internal medicine, gynecology/urology or endoscopy. One of Willman's expert witnesses has concluded that Willman competed with physicians who practice general surgery (Willman's specialty) as well as urology, gynecology, gastroenterology and internal medicine. Therefore, Willman asserts that the physicians who reviewed his performance were his competitors and that a reasonable inference arises that they acted against him with an anti-competitive motive.

The "personal stake" exception "arises when the officers or agents were, at the time of the conspiracy, acting beyond the scope of their authority or for their own benefit." *Morton Buildings of Nebraska, Inc. v. Morton Buildings, Inc,* 531 F.2d 910, 917 (8th Cir.1976) (citing *Greenville Pub. Co. v. Daily Reflector, Inc.,* 496 F.2d 391, 399 (4th Cir. 1974)).

In *Oksanen,* this same argument was made and rejected. There, two competitors of Dr. Oksanen were involved in the peer review, although one of the competitors was not accepting new patients:

In any event, the more important aspect of *Greenville* for the purposes of peer review is the degree of control the officer or agent with the independent interest exercised over the defendant firm's decision making process. If the officer cannot cause a restraint to be imposed and his firm would have taken the action anyway, then any independent interest is largely irrelevant to antitrust analysis. *See* P. Areeda, Antitrust Law, ¶ 1471d & g (1986). In *Greenville,* the individual who had an interest in another firm was also the defendant company's president, director, and shareholder. Consequently, he could control the defendant company's decisions.

Here, by contrast, the medical staff had no such control. 'To give advice when asked by the decision maker is not equivalent to being the decision maker itself.' *Pennsylvania Dental Ass'n v. Medical Serv. Ass'n,* 745 F.2d 248, 259 (3d Cir.1984). The Board of Trustees at Page Memorial requested and encouraged the medical staff to take corrective action against Oksanen. The Board in the end retained authority over staff privilege decisions at Page Memorial. Because the challenged decision was subject to review by the hospital and because decision making authority in Dr. Oksanen's case was dispersed among a number of individuals, the personal stake exception is inapplicable.

*Oksanen,* 945 F.2d at 705.

In the present case, the final decision on questions of staff privileges rested with the

Boards of the defendant hospitals. On July 22, 1983, the Board of Trustees of Methodist Medical Center met and voted unanimously by secret ballot to suspend Willman's privileges through December 31, 1983. Two of the thirteen Board members present at this meeting were physicians. Neither physician is a defendant in this case. On May 17, 1984, the Board of Trustees for Methodist met and considered the recommendation from the medical staff executive committee to deny Willman's application for reappointment. Four of the 16 Board members present were physicians. One of the physicians is a defendant. Fourteen votes were cast to deny Willman's application with two abstentions. Beheler, the defendant who was present, abstained. On December 18, 1985, the Board of Methodist voted unanimously to approve the decision of the executive committee of the medical staff which denied Willman's request for appointment to the staff. Five of the 14 Board members present were physicians. Only one physician Board member is a defendant in this case.

At St. Joseph, the executive committee of the Board of Directors on August 25, 1982, directed the medical staff to review the action taken at Methodist restricting Willman's privileges. No defendants were present. The Board met again on November 7, 1983, with 15 members present. Three of the Board members were physicians, but only one defendant was present. At this meeting, Willman's privileges at St. Joseph Hospital were revoked by a unanimous vote. At the November 27, 1985, Board meeting, the Board unanimously voted to deny Willman's application for appointment to the medical staff. Eleven Board members were present, three of whom were physicians. Only one physician defendant was present.

At each of the crucial Board meetings in both hospitals, physicians made up a small percent of the voting Board members and only some of these physicians are defendants. At no meeting did the doctor members of either Board provide the determining votes. Therefore, no reasonable jury could conclude that the defendant doctors actually controlled the Board's decision regarding Willman's staff privileges.

Although the hospitals here could not conspire with their staff doctors, members of the medical staff could conspire with each other and theoretically could coerce the Hospital Board to take action consistent with the objective of the conspiracy. "A medical staff can be comprised of physicians with independent and at times competing economic interests. As a result, when these actors join together to take action among themselves, they are unlike a single entity and therefore they have the capacity to conspire as a matter of law." *Oksanen,* 945 F.2d at 706.

In the present case, Willman has not shown that the defendant doctors, who allegedly competed with Willman, did anything other than meet with other doctors during the peer review process. Willman seems to believe that "the fact the medical staff met and took action against him through the peer review process proves the existence of a conspiracy." *Id.* But just as in *Oksanen,* this is not enough. "[T]here must be something more such as a conscious commitment by the medical staff to coerce the hospital into accepting its recommendation." *Id.*

Here, each board member has presented an affidavit stating that he/she made the final decision and that he/she acted independently of the staff. "[D]enial of the conspiracy by defendant's affidavits is sufficient, under Rule 56(e), to shift the burden to plaintiff to establish a factual question by the offering of evidence of the conspiracy." *Pontius v. Children's Hospital,* 552 F.Supp. 1352, 1375 (W.D.Pa.1982) (citing *Daley v. St. Agnes Hospital, Inc.,* 490 F.Supp. 1309 (E.D.Pa. 1980); *see also Lambs Patio Theatre, Inc. v. Unusual Film Exchanges, Inc.,* 582 F.2d 1068 (7th Cir.1978)). Plaintiff provides a couple of affidavits that state that hospital Boards defer to staff recommendations about staff privileges. Even if the Boards of the two hospitals did defer to staff recommendations, there is no evidence they did so because they were coerced. As the affidavits of the non-physician Board members state, the Board members exercised their independent judgment.

Therefore, because this case is closer to *Oksanen* than *Greenville,* the personal stake exception is inapplicable. The doctrine of

intracorporate immunity prevents plaintiff from establishing that there was a conspiracy between separate entities; the hospitals and their medical staffs were a single entity.

If I assume that the doctors not only had the capacity to conspire with one another but that they did indeed conspire during the peer review process, this conspiracy would be meaningless in the context of the § 1 claims advanced by plaintiff "if the staff lacks the final authority to implement any agreement that it does reach." *Oksanen,* 945 F.2d at 706. Because Willman has not presented facts from which a reasonable jury could conclude that the defendant doctors coerced the Boards of the hospitals to effectuate any agreement they had, his § 1 claim against defendant doctors must fail for lack of a causal connection between the assumed conspiracy and the action taken by the Board of each hospital on the several votes involving plaintiff's hospital privileges.

■ Even if a medical staff and a hospital can conspire to violate § 1 of the Sherman Act, Willman's claims as to Counts I and II would still fail because no reasonable juror could infer the existence of an antitrust conspiracy from the circumstantial evidence in this case. As stated by the Eighth Circuit Court of Appeals in *Lovett v. General Motors Corp.,* 998 F.2d 575, 578 (8th Cir.1993), "[b]ecause a fine line separates unlawful concerted action from legitimate business practices, an antitrust conspiracy cannot be inferred from 'highly ambiguous evidence.'" (quoting *Monsanto v. Spray–Rite Service Corp.,* 465 U.S. 752, 763, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984)). Although the court "view[s] the evidence and all reasonable inferences in the light most favorable" to the plaintiff, "the range of permissible inferences from ambiguous evidence is limited in a section one case." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). "*Monsanto* does not permit a jury to infer the existence of a conspiracy from ambiguous evidence." *Id.* at 579, 106 S.Ct. at 1352. The court in *Lovett* also stated that "[c]onduct that is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an infer-

ence of antitrust conspiracy." *Id.* "An inference of conspiracy must be 'reasonable in light of the competing inferences of independent action.'" *Id.* (quoting *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356). Although *Lovett* was a review of a judgment as a matter of law, the standard for judging evidence on a motion for summary judgment parallels that of a directed verdict, the precursor to judgment as a matter of law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

In the present case, Willman presents no direct evidence of a conspiracy. However, Willman argues that the existence of a conspiracy can be inferred from facts which he has presented. Therefore, I must "decide whether a reasonable juror could infer the existence of a conspiracy from the circumstantial evidence." *Lovett,* 998 F.2d at 578. The heart of Willman's conspiracy claim is his factual conclusion that competitors participated in the peer review process. Willman then concludes that the peer review process was a "sham" to cover up his competitors' intent to drive him out of the St. Joseph market.

Plaintiff cites *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) for the proposition that competitors of a physician should not participate in peer review of that physician. *Gibson* involved licensing issues at the state level, not peer review. In *Gibson,* the Alabama Board of Optometry could only be composed of optometrists who were in private practice. Of the 192 optometrists in the state, 100 were in private practice and 92 were employed by others. There were no charges of substandard care in *Gibson.* "[T]he aim of the Board was to revoke the licenses of all optometrists in the state that were employed by business corporations ... and that these optometrists accounted for nearly half of all optometrists practicing in Alabama." *Id.* at 578, 93 S.Ct. at 1698. Driving half of the optometrists in the state out of business would have a direct, measurable effect on the business of the remaining private optometrists.

Here, Willman lists 43 physicians who he contends were competitors. One doctor's pa-

tients divided among 43 physicians does not suggest the level of pecuniary interest that made the state licensure proceeding in *Gibson* a violation of due process. The insignificant competitive advantage to be gained by the alleged co-conspirators destroys the reasonableness of the inference Willman seeks to draw from the participation of his competitors.

In addition, Willman supports his argument that the peer review process was a sham by presenting expert testimony that the care he provided was proper. However, Willman's own medical experts, even if believed fully, do not establish that the peer reviewers were so misguided that one could conclude reasonably that the process was a sham. For instance, Dr. Miller, one of Willman's medical experts, testified that "some of the cases, you know, represent outer edges of what we perceive as standard of care." Miller depo. p. 171, 1. 19–22. Also, Willman's own experts do not state that the peer review committees were unreasonable to be concerned about the issues they inquired about. If believed, Willman's experts establish that reasonable medical minds may differ about how seriously Willman's treatment departed from acceptable practice. This would not allow a reasonable jury to conclude that the process was a sham.

Because the purpose of peer review is to maintain quality patient care and because hospitals have an "unquestioned right to exercise some control over the identity and the number of doctors to whom it accords staff privileges," (*Jefferson Parish Hosp. Dist. No. 12 v. Hyde*, 466 U.S. 2, 30, 104 S.Ct. 1551, 1568, 80 L.Ed.2d 2 (1984)), a peer review process that is at least as consistent with this lawful purpose as with an illegal conspiracy to restrain trade cannot support an inference of antitrust conspiracy and does not justify subjecting these health care provider defendants to the expense of a lengthy jury trial.

*Bolt v. Halifax Hospital Medical Center*, 891 F.2d 810, 821 (11th Cir.1990), *cert. denied*, 495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990), relied on by plaintiff, demonstrates the deficiency in the factual record presented by plaintiff. In *Bolt*, the court concluded that a conspiracy could easily be inferred from expert testimony that no reasonable medical practitioner could have reached the same conclusion about a physician that was reached by the peer reviewers in that case. But none of Willman's experts state that a reasonable medical practitioner could not have concluded that Willman's work was substandard. The mere fact that Willman's experts may reach a different conclusion about the quality of care furnished by Willman is not sufficient to create an inference that the doctors and hospitals conspired in violation of antitrust law when they reached a different but nevertheless reasonable conclusion about the quality of care Willman's patients received.

Plaintiff points to the refusal by defendant doctors to consider Willman's performance during the 15 months in which Willman practiced at the hospitals pursuant to a court order from Buchanan County, Missouri, as evidence of improper motive. There was friction between the plaintiff and defendants. The defendants believed that they were maintaining practice standards that would benefit the hospitals' reputation and protect the public. Plaintiff believed that he was being treated unfairly. As a result, Willman secretly tape-recorded numerous conversations with physicians in St. Joseph. Also, he obtained a court order requiring St. Joseph Hospital to allow him to practice in that hospital. Under these circumstances, not considering plaintiff's performance in the hospital while under the court order was just as likely to be because of the friction between Willman and the members of the medical staff as because of any antitrust conspiracy.

Certainly, Willman has had a full opportunity to develop the evidence in this case. Over 100 days of depositions have been taken. The inferences Willman relies on to support his conspiracy theory conflict with economic reality because the hospitals had every incentive to include as many physicians as possible on their staffs. The more staff physicians a hospital has admitting and treating patients, the more revenue for the hospital.

Therefore, because the hospital and its medical staff do not have the capacity to conspire and because, even if they did have

this capacity, the plaintiff's evidence of conspiracy is not sufficient to create a genuine issue for trial, summary judgment will be granted on Counts I and II of the Complaint.

## B. *Count III*

■ In Count III, plaintiff alleges a violation of 15 U.S.C. § 2. According to the plaintiff "[c]ount III of Dr. Willman's complaint states a cause of action pursuant to Section 2 of the Sherman Act (15 U.S.C. § 2) for two closely related theories: abuse of an essential facility and monopoly leveraging." Pl. Brief at 22.

Section 2 of the Sherman Act "prohibits monopolization and attempted monopolization of trade or commerce. The offense of monopoly under section 2 has two elements: (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from the growth or development of a superior product, business acumen, or historic accident." *City of Malden, Mo. v. Union Elec. Co.*, 887 F.2d 157, 160 n. 3 (8th Cir. 1989) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). In order to "demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, —— U.S. ——, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993).

■ "Under the 'bottleneck' or essential facilities doctrine, those in possession of facilities which cannot practically be duplicated must share the facilities with their competitors on fair terms." *City of Malden*, 887 F.2d at 160. (citations omitted). The elements of the essential facilities doctrine are: 1) control of an essential facility by a monopolist; 2) the inability to practically or economically duplicate the facility; and 3) the unreasonable denial of the use of the facility to a competitor when such use is economically and technically feasible. *Id.*

With regard to the third element, "the antitrust laws do not require that an essential facility be shared if such sharing would be impractical or would inhibit the defendant's ability to serve its customers adequately." *Hecht v. Pro–Football, Inc.*, 570 F.2d 982, 992–93 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978) (footnote omitted). Applying this principle to a hospital's efforts to monitor the performance of staff doctors, several courts have found that the essential facilities doctrine is not applicable when a hospital facility is denied to a physician. In *Pontius v. Children's Hospital*, 552 F.Supp. 1352, 1371 (W.D.Pa.1982), the court stated:

> We believe it would be singularly inappropriate to apply a doctrine which would prevent a hospital from keeping doctors it had adjudged unqualified off of its staff. Neither public policy nor the Sherman Act can continence such a result. Consequently we now hold that the essential facilities doctrine is inapplicable to hospital staff privileges decisions.

In *Robles v. Humana Hospital Cartersville*, 785 F.Supp. 989, 996 (N.D.Ga.1992), the court, after quoting this language from *Pontius*, concluded "this Court concludes that the essential facilities doctrine is not applicable to cases involving hospital peer review decisions which revoke or limit a doctor's medical staff privileges."

In *Castelli v. Meadville Medical Center*, 702 F.Supp. 1201, 1209 (W.D.Pa.1988) the court granted summary judgement in a case involving an exclusive contract with a hospital because the court was "persuaded that the essential facilities doctrine is not appropriate for a hospital's decisions about professional services."

I agree with this conclusion. Hospital decisions to revoke or limit staff privileges are essentially pro-competitive. "[T]he peer review process, by policing the competence and conduct of doctors, can enhance competition." *Oksanen*, 945 F.2d at 709. By monitoring the quality of care received by patients at the hospital, the hospital improves its competitive position in the eyes of the health care consumer.

■ if the essential facilities doctrine were applicable, plaintiff's claim would still fail because the hospitals' concerns about

the care provided by Willman were not unreasonable. As previously discussed, even Willman's experts concede that the questions asked by the defendants during peer review were not unreasonable. Also, a Missouri state court has stated that one committee's decision to recommend revocation of Willman's privileges at St. Joseph's Hospital was reasonable. *Willman v. Dooner,* 770 S.W.2d 275 (Mo.Ct.App.1989). "This Committee was not on a witch hunt. They picked Willman for good reasons." *Id.* at 278. In light of these considerations, the essential facilities doctrine is not available in this hospital staff privileges case.

Furthermore, even if I were to hold that the doctrine is applicable to staff privileges cases, the plaintiff's claim would still fail because he fails to show that the control of the hospital facility carries with it the power to eliminate competition in the downstream market.

In *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992), the court held that the essential facility doctrine only applies to a monopolist if the monopolist's control over the facility carries with it the power to eliminate competition in the downstream market.

As stated in defendants' brief, the hospitals could not eliminate competition for general surgical services or any other medical services in St. Joseph:

> *Alaska* applies with equal force here. In this case, the "monopolist," Heartland, is incapable of ever eliminating competition in the market of general surgical services in St. Joseph, MO. plaintiff has not claimed, and could not claim, that surgery on persons in St. Joseph would cease to be performed if defendant refused to allow anyone to use its surgical facilities. Even if Heartland closed its doors to *all* surgeons (a *reductio ad absudum,* to be sure), Heartland could not prevent physicians from performing surgery for people in St. Joseph, although the site of that surgery might move from St. Joseph to some other location such as Liberty, North Kansas City, Kansas City, Cameron or Chillicothe. Thus, it is impossible for Heartland to ever

monopolize the 'downstream' market of general surgery, and the essential facilities doctrine is not applicable to this Section 2 claim.

Def. Brief at 6.

Additionally, although the essential facilities doctrine has its own elements, it is still a claim under § 2 of the Sherman Act for either illegal monopoly or attempted monopoly. The second element of a monopoly claim is "the willful acquisition or maintenance of" monopoly power. *United States v. Grinnell,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). The Fourth Circuit Court of Appeals stated that in order to satisfy this element the plaintiff must show that a jury could find no valid business reason or concern for efficiency in the choice the defendant made. *White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 105 (4th Cir. 1987) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985)). Specific intent is also required in an attempted monopoly. *Spectrum Sports, Inc. v. McQuillan,* —— U.S. ——, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993).

Although the plaintiff has presented expert testimony that the expert would not have revoked Willman's hospital privileges, these experts do not state that it was unreasonable for either hospital to revoke his privileges. Willman has been unable to present any evidence that the hospitals did not have valid business reasons for seeking to revoke the hospital privileges of a doctor who was believed reasonably to have rendered substandard care. Therefore, summary judgment will be granted as to the essential facilities claim of Count III.

■ Plaintiff also asserts a claim under § 2 of the Sherman Act for monopoly leveraging. Plaintiff relies on *Berkey Photo Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), and *Carleton v. Vermont Dairy Herd Improvement Association Inc.,* 782 F.Supp. 926 (D.Vt.1991) for the proposition that monopoly leveraging is a separate claim under § 2. However, the Second Circuit Court of Appeals, after the

**1534**

*Berkey Photo* decision, stated that the recognition of a claim for monopoly leveraging was dictum. Also, *Berkey Photo* was a case involving a tying claim, not a case involving the denial of essential facilities. *Twin Laboratories v. Weider Health & Fitness,* 900 F.2d 566, 570 (2d Cir.1990). No tying claim has been alleged in this case.

In addition, the Ninth Circuit Court of Appeals has held that "monopoly leveraging" is not an independent theory for recovery under § 2 of the Sherman Act, it is just a claim for an attempted monopolization of a second market. *Alaska Airlines,* 948 F.2d at 547.

Therefore, because monopoly leveraging is just another way of alleging either monopolization or attempted monopolization, and because I have already determined that defendants are entitled to summary judgment on a claim of monopolization or attempted monopolization, summary judgment will be granted on all claims in Count III.

C. *Count IV and the Counterclaim*

Having granted summary judgement on Counts I, II and III, I decline to exercise supplemental jurisdiction as to the state law claims asserted in Count IV and the Counterclaim.

IV. *Conclusion*

█ Plaintiff is no stranger to litigation over the peer review proceedings that led to the revocation of his privileges at the hospitals. *See Willman v. Dooner,* 770 S.W.2d 275 (Mo.Ct.App.1989); *State ex rel. St. Joseph Hospital v. Fenner,* 726 S.W.2d 393 (Mo.Ct.App.1987); *State ex rel. Willman v. St. Joseph Hospital,* 707 S.W.2d 828 (Mo.Ct. App.1986); and *State ex rel. Willman v. St. Joseph Hospital,* 684 S.W.2d 408 (Mo.Ct.App. 1984). The antitrust laws were not intended to be used to subject health care providers to protracted and expensive litigation over efforts to protect the public from substandard care when the evidence of defendants' acts is just as consistent with permissible self-regulation in the public interest as with an illegal conspiracy. *See Lovett v. General Motors Corp.,* 998 F.2d at 577.

Accordingly, for the reasons stated, it is ORDERED that:

1) defendants are granted summary judgment as to Counts I and II of plaintiff's Complaint;

2) defendants are granted summary judgment as to Count III of plaintiff's Complaint; and

3) Count IV and the Counterclaim are dismissed without prejudice.